[Nos. A101668, A104440. First Dist., Div. Four. June 30, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
STEVEN LLOYD PRICE, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III. and IV.

### Counsel

Richard J. Krech, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Christina Vom Saal and Gregg E. Zywicke, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**REARDON, J.**—A jury convicted appellant Steven Price of inflicting corporal injury on a spouse and assault by force likely to produce great bodily injury. (Pen. Code,[1] §§ 245, subd. (a)(1), 273.5, subds. (a), (e).) He was given a suspended prison sentence and was granted probation for a term of five years. (Case No. A101668.)[2] Within a year, his probation was revoked and he was sentenced to three years in state prison. (Case No. A104440.)[3] In this consolidated appeal, Steven contends that (1) the admission of a hearsay statement made by his spouse to a police officer violated his Sixth Amendment right to confront witnesses against him; (2) his trial counsel's failure to object to a second hearsay statement made by his spouse to another police officer constituted ineffective assistance of counsel; (3) the admission of expert testimony regarding strangulation as a possible cause of death was improper and prejudicial; and (4) the admission of evidence of a prior incident of domestic violence denied him due process. For their part, the People challenge (5) the sentence imposed as legally unauthorized. We reverse and remand for resentencing, but otherwise affirm the judgments.

## I. FACTS

### A. *The Incident*

On July 21, 2002, Antioch police received a 911 call from a local residence. Shortly before 6:00 a.m., Antioch Police Officer Santiago Martinez went there to investigate. He knocked several times and had his dispatcher place a call inside the home. Three or four minutes after his arrival, Jamilah Price opened the door. She was breathing hard, kept cracking her knuckles and spoke in a very low voice. Jamilah[4] had a small cut over her right eye and two long scratches on one side of her neck. The scratches were as long as three inches running from back to front; the skin was pink and red as if the layer above had been scratched off. She also had a very small bloodstain on the collar of her shirt. Jamilah seemed to have been crying; she also seemed nervous and very frightened.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] Steven Price filed a timely notice of appeal from the judgment of conviction.

[3] Steven Price filed a timely notice of appeal from the order committing him to state prison after revocation of probation. His counsel on appeal chose not to file a separate brief on the appeal of the probation revocation. His opening brief in the consolidated appeals does not address any issues related to the probation revocation, despite a declaration from his counsel stating that it did. The Attorney General's brief raised a sentencing issue, which Steven's counsel addressed in his reply brief. Thus, it appears that Steven's counsel challenges the sentence imposed after revocation of probation indirectly, if he succeeds in obtaining a reversal of the underlying conviction.

[4] To avoid confusion, we refer to Steven and Jamilah Price by their given names.

Officer Martinez assumed from these circumstances that something was wrong—that Jamilah was the victim of domestic violence. He told her that the police had received a 911 call. Having observed her demeanor, he asked if she was okay. He asked if she wanted medical treatment, but she declined. Jamilah told him that everything was okay and denied calling 911. He did not believe that nothing was wrong. Officer Martinez asked if she was alone and she said that she was there with her two children; she told Officer Martinez that she did not need him. She allowed him to enter the home to determine whether the two children were okay. As he walked around the house, he noticed that Jamilah seemed to be placing her body in a manner that blocked him from some areas of the house. She still spoke in a low voice and still seemed very frightened, although she kept repeating that everything was okay.

Officer Martinez found the children in bed. One child feigned being asleep, raising a suspicion that something was not right. The covers on the bed were draped down and when Officer Martinez looked under the bed, he found appellant Steven Price hiding there. He was lying close to the wall on his stomach. Two or three times, Officer Martinez asked him to come out from under the bed, but Steven acted as if he could not hear or did not know the officer addressed him. Steven did not come out from under the bed; Officer Martinez and another officer had to pull him out.

Steven was uncooperative, struggling a little with police. He repeatedly said "I didn't do nothing" and told police to leave him alone. The officers took Steven outside and handcuffed him. Walking behind him, Officer Martinez noticed that a palm-sized part of the back of Steven's shirt was soaked with fresh blood. On further investigation, the officers learned that he had a one-inch wide puncture wound in his back. An ambulance was summoned and Steven was taken to a hospital. Jamilah was also offered medical attention again, but she again refused.

About 30 minutes after police arrived at the Price residence, Jamilah gave a statement to Officer Martinez about what had happened. She had been upset with Steven for borrowing her car and failing to return it until three days later. During his absence, she had poured bleach into his fish tank, killing his fish. When he returned home, he was very upset about this. They began to argue and Jamilah went into their bedroom to get out of earshot of her children.

Jamilah told police that Steven followed her into the bedroom and pushed her onto the bed.[5] Seeing a taser nearby, she grabbed for it, but Steven slapped it out of her hands. He then slapped her, straddled her, pinned her down and—placing two hands around her throat—began strangling her. Jamilah feared she would lose consciousness. Spying a knife on the night-stand, she took it and began swinging and stabbing at Steven in an attempt to get him off of her. He continued choking her and then stopped, apparently out of breath. Officer Martinez collected a taser and two small knives from the bedroom as evidence.

## B. *Pretrial Matters*

In October 2002, Steven Price was by information charged with inflicting corporal injury resulting in a traumatic condition to his spouse Jamilah, who was the mother of his children. The information alleged a prior misdemeanor conviction for the same offense. It also charged Steven with assault by force likely to produce great bodily injury. (See §§ 245, subd. (a)(1), 273.5, subds. (a), (e).) Steven pled not guilty to these charges.

Before trial, the trial court ruled that it would permit the prosecution to offer character evidence of a 2001 incident of domestic violence that led to a guilty plea and misdemeanor conviction for inflicting corporal injury on a spouse. (See Evid. Code, § 1109.) Outside the presence of the jury, Steven admitted the prior conviction. (See § 273.5, subd. (e)(1).) The charge that was read to the jury at the start of trial did not include any mention of the prior conviction.

## C. *Trial Evidence of the July 2002 Incident*

Jamilah did not want Steven prosecuted. When she was called to testify for the People at trial, she declined to answer most substantive questions relating to the July 2002 incident. She admitted that on July 21, 2002, she was living with Steven and her two children in the Antioch home. That night, she was upset with Steven because he had been gone for several days. She refused to talk about what happened after he returned home that morning.

Outside of the presence of the jury, Jamilah's counsel informed the trial court that she would decline to answer further questions on Fifth Amendment grounds. Even if she were offered immunity from prosecution or were held in contempt, Jamilah would decline to answer these questions. The People sought to have her declared to be an unavailable witness.(See Evid. Code, § 240.) Jamilah was not questioned further about the Julys 2002 incident.

---

[5] There was conflicting evidence about whether Jamilah reported that she was sitting or standing before Steven pushed her.

Officer Martinez testified about the events of July 2002—what he observed and what Jamilah told him at their home on the night of the incident. The jury saw a photograph of Steven's back injury, but no photographs were taken of Jamilah. A doctor later described Steven's wound as a two and one-half-inch deep laceration requiring two stitches.

Antioch Police Officer Matt Ernst also testified about statements that Jamilah made to him on July 22, 2002. He told the jury that he telephoned her the day after the incident to clarify some information she gave to Officer Martinez on July 21. When Ernst reviewed the statement that Jamilah gave to Martinez, she told him that Steven had pinned her down on the bed with his body, had held her down and had choked her with both hands. Fearing that he would choke her until she was unconscious, she grabbed a nearby knife and flailed at him with it in order to get him to release her. She stabbed him, although she told Ernst that she did not intend to do so. She did not want him to be arrested or prosecuted—she later sent a letter saying as much. On the telephone, Ernst offered her information about obtaining a restraining order, but Jamilah did not want one.

## D. *Evidence of Prior Domestic Violence*

Jamilah testified about a domestic violence incident that occurred on January 11, 2001. She returned home after work, having asked Steven to leave their home. She was angry to discover that he was still there. They argued and fought. Jamilah grabbed a fingernail file. At some point, she was pushed down onto the ground. She did not recall whether Steven held her on the ground by her throat or whether she hit her head. Jamilah did not remember any more until the police and an ambulance were at the house. She had suffered a head injury, which was bleeding.[6] She did not remember telling police that Steven had grabbed her by the throat or that he slammed her head against a speaker box. The police may have given her information about obtaining a restraining order, but she did not ask for one. She did not remember telling a hospital nurse that she tripped and fell. She denied being afraid of Steven and told the jury that she did not want him arrested or prosecuted—she just wanted him to leave.

Jamilah's mother—Jacqueline Thomas—also told the jury about the January 2001 incident. On that day, she drove her daughter home after work. Steven and their two children were already at home. She could tell that Jamilah had been drinking; she did not know if Steven had been. Thomas overheard Steven and Jamilah arguing and saw the argument evolve into an

---

[6] A photograph of Jamilah's January 2001 head injury was admitted into evidence.

altercation. At one point, she saw Steven force Jamilah's head back into a speaker box, causing blood to run down the back of her neck.[7]

Thomas testified that police officers came to the house as a result of this incident. She did not recall telling police that she planned to take Jamilah and the two children to her house because her daughter was afraid of Steven, nor did she remember reporting that Steven had Jamilah in a headlock or that he held her by the throat when he slammed her head against the speaker box.

Antioch Police Officer Tara McBroom testified that when she went to the Price home on January 11, 2001, Thomas was outside. Thomas reported that the Prices were having a fight inside the house. Officer McBroom entered the house, announced her presence and asked everyone to come to the front room. Steven and Jamilah came out. Jamilah was shaking and crying, was very emotional and obviously very upset. She had blood matted in her hair on the back of her head. Jamilah had a slight odor of alcohol about her, but did not appear to be intoxicated. Steven did not smell of alcohol. He had several slight scratches on his forearms.

Other officers arrived and the couple was interviewed separately. Jamilah told Officer McBroom that she had asked Steven to pack up his things and leave the house before she came home that day. When she got home, she and Steven argued. He followed her out of their bedroom into the living room. He came at her and she grabbed a nail file to defend herself. Then, he grabbed her by the throat, choked her, pushed her down and repeatedly hit the back of her head against a wooden speaker box. He got her into a headlock and spun her around facing the entry door when her mother walked into the room. Steven dropped Jamilah onto the floor. He brought her a rag and tried to wipe the blood off of her. He told Jamilah not to tell the police. She told Steven not to touch her—to leave her alone.

Officer McBroom saw that Jamilah had a substantial gash on the back of her head. Blood continued to flow from the cut, which was as long as two inches. At first, Jamilah did not want medical assistance, but after she began to feel light-headed, she agreed that police should call an ambulance. A photograph of the head wound was admitted into evidence. The officer also observed red marks and scratches on Jamilah's neck.

Officer McBroom saw blood on the living room floor near the speaker box. She also saw the nail file that Jamilah used. She described it as a flexible

---

[7] Although she denied testifying at a prior hearing that Jamilah was on the floor, after reading a transcript of the preliminary hearing testimony related to the January 2001 incident, the portions of the transcript read as part of the questioning during Thomas's cross-examination suggested that she had testified to this effect at that hearing.

emery board that came to a point at the end; it was not a metal file. When questioned, the officer told the jury that Jamilah had said that she grabbed the nail file to defend herself—she did not say that she had come at Steven with the file.

Officer McBroom took a statement from Thomas, who reported that she had picked up Jamilah from the BART station. Thomas knew that Steven and Jamilah had argued that day. She intended to take Jamilah home, get the children and take the three of them back to her own home because she feared that Steven would become violent. Once they arrived at the Price house, Thomas remained outside while Jamilah went in. Thomas entered the house after the Prices' daughter came running outside saying that her parents were fighting. She saw Steven hitting Jamilah's head against the speaker box. He stopped when she came in, dropping Jamilah to the floor. Thomas later reported that she then called 911.

The officer offered Jamilah an emergency protective order, which she asked to receive. Officer McBroom obtained one for her. The following day, the officer saw Jamilah again. Jamilah reported that Steven had been calling her from jail. She had changed her telephone number and gave the new number to police. Officer McBroom also saw that Jamilah's head wound had been sutured or stapled.

By stipulation, the jury learned that in April 2001, Steven pled no contest to a misdemeanor count of inflicting corporal injury on a spouse stemming from the January 11, 2001 incident.

E. *Battered Women's Syndrome Evidence*

The jury also heard evidence from two expert witnesses. Marjorie Cusick was a psychotherapist who specialized in domestic violence cases. She testified as an expert on battered women's syndrome. She told the jury that most victims of domestic violence—which she defined as a power struggle— were women. In her experience, she observed an often repeated cycle in domestic violence cases. First, an acute battering incident separates the couple. This is followed by a make-up or honeymoon period when the couple reunites. Thereafter, a tension-building period occurs when the couple goes into a power struggle about who holds the power in the relationship. This tense period is followed by another abusive incident. Typically, neither one of the couple is aware of this cycle.

Cusick told the jury that many battered women share certain characteristics that make them more susceptible to remaining in a relationship despite battering incidents. These women are in denial about the violence. They

accommodate the abusers by changing their own behavior in order to avoid being hurt. They feel that the violence is their fault—that they can control the batterers by altering their own behavior. They engage in a lot of rationalization to make sense of the violence. They often minimize the actual violence that they suffer. In severe cases, the women disassociate—they allow their minds to go elsewhere so they will not feel the abuse. Sometimes, the women have no memory of any details of the abuse.

These women are not always meek, Cusick told the jury, but may be as aggressive as the batterers are. It is not uncommon for these women to have other problems relating to emotions, anger or substance abuse. Often, the victims are too ashamed to report the domestic violence to authorities. If the victim does report the incident, it is common for the victim to later urge prosecutors to drop any charges or to be reluctant to testify against the batterer. This may occur for several reasons—because the relationship is in a honeymoon period again, because the victim does not want to suffer the shame and humiliation of having a private matter publicized, because of fear of retaliation or because recounting the abuse causes anxiety.

She also described battering men as often very conscious of their abusive behavior. They could be very deliberate about it. For example, a batterer might choose what part of a victim's body to batter depending on whether he wanted the victim to go to work or not. An incident can be triggered if the batterer feels powerless and that the victim is out of his control. Batterers use intimidation and abuse to regain a sense of power and control.

Despite a public perception that these women could leave these relationships if they wanted to do so, Cusick opined that this is difficult for these women to do, for many reasons. Some victims want to keep their children in a family setting; some lack the economic resources to leave; some fear retaliation; some love the battering person and want to try to make the relationship work; and some are influenced by religious and cultural views of relationships. These relationships often continue until a major event occurs that changes the family dynamic.

F. *Strangulation Evidence*

A second expert—Dr. Arnold Josselson—testified that strangulation could cause death under certain circumstances.[8] He told the jury that strangled persons often had bruises, redness or scratches on their necks. Fingernail scratches on the victim's neck were consistent with manual strangulation—

---

[8] He offered only general testimony, as he had not reviewed any information about the Price case.

when the strangler uses his or her hands on the victim's neck. The more the victim struggles, the more marks will be left on the neck. Bruises would be harder to see if the victim was dark-skinned.[9] The victim might also suffer a voice change as the result of damage to the larynx from strangulation.

He testified that if enough pressure is applied to the blood vessels, the victim may lose consciousness because of loss of blood and oxygen to the brain. If the pressure continues, Dr. Josselson opined, the victim could die of strangulation.[10] Loss of consciousness could occur within 10 or 15 seconds after sufficient pressure is applied, he told the jury. Prolonged deprivation of blood to the brain from manual strangulation would likely result in death.

## G. *Steven's Defense*

In his defense, Steven called Marcia Medina—a criminal investigator for the public defender's office—as a witness. She testified that she met with Jamilah in November 2002. When asked about the July 2002 incident, Jamilah said that she had assaulted Steven first. She appeared calm, but frustrated that the case against Steven was still going forward against her wishes. No one seemed to be listening to her.

To bolster Steven's defense, the jury heard Jamilah's preliminary hearing testimony in full. At the earlier proceeding, Jamilah testified about the July 2002 incident. As she had told Medina, she testified on direct examination that she was the initial aggressor, stinging him with a taser before he physically assaulted her. Jamilah then stabbed him in the back with a knife. She also admitted at the preliminary hearing that Steven had choked her before, in January 2001. On cross-examination, Jamilah explained that she was angry with Steven for many reasons on July 21—one of which was that she had recently seen photographs of a woman in his wallet, leading her to suspect that he was having an affair. While he had been gone, she had been so angry that she cut up his clothes and killed his fish to make him angry. She had also had quite a few glasses of wine to drink that day. When Steven returned with an anniversary card in his hand—July 22 was their wedding anniversary—she questioned him angrily about the photographs. After she stabbed Steven, Jamilah was afraid to tell the police that he was injured because she had hurt him. During closing argument, Steven's counsel relied on the version of events that Jamilah testified to at the preliminary hearing to set out the facts of the July 2002 incident. She argued that Jamilah, not Steven, was the aggressor.

---

[9] Jamilah was African-American.

[10] The expert witness distinguished between strangulation—applying pressure to the blood vessels of the neck—and choking—blocking the airway.

## H. *Verdict, Sentencing, and Probation Revocation*

The jury found Steven guilty of both charges—inflicting corporal injury on a spouse and assault by force likely to produce great bodily injury. (See §§ 245, subd. (a)(1), 273.5, subds. (a), (e).) The People asked that Steven be sentenced to five years in state prison while Steven—with Jamilah's support—sought a term of probation. In January 2003, Steven was sentenced to state prison,[11] but the execution of sentence was suspended and he was placed on probation for five years. Terms of probation included a one-year term in county jail, attendance at 52 weeks of anger management classes, maintaining employment and staying away from Jamilah.

Steven had been in custody since his arrest. In March 2003, he was released from county jail. In April 2003, he sought modification of the probation order, asking to eliminate the requirement that he have no contact with Jamilah. In May 2003, the trial court determined that Steven had attended four or five anger management classes. It denied the request for modification at that time, but ruled that once Steven completed 20 of the 52 required sessions, it would reconsider his request.

In August 2003, a petition to revoke his probation was filed, alleging that he had failed to attend the required four anger management classes and had failed to seek and maintain employment. Probation was summarily revoked and a bench warrant was issued for Steven's arrest. Steven was brought into custody within a few days. A supplemental petition alleged that Steven had also violated probation by submitting a false medical document to his probation officer.

In October 2003, a probation revocation hearing was conducted. The trial court heard evidence that Steven had provided his probation officer with a falsified medical excuse to explain why he failed to attend some of his required domestic violence group meetings. Evidence was also offered that Steven failed to seek or obtain employment. On the basis of this evidence, Steven was found to be in violation of the terms of his probation for missing three domestic violence classes, failing to maintain employment, and submitting a false medical document to his probation officer. He waived referring his case for another probation report. He was immediately sentenced to a three-year term in state prison—a midterm of three years for inflicting corporal injury on his spouse and a stayed midterm of three years for assault. (See §§ 245, subd. (a), 273.5, subds. (a), (e), 654.)

---

[11] The minutes of the sentencing hearing are inconsistent about what term was imposed. (See §§ 245, subd. (a), 273.5, subds. (a), (e), 654.) The issue of what sentence was actually imposed and whether it was lawful is discussed later in our opinion. (See pt. VI., *post*.)

## II. CONFRONTATION

First, Steven contends that admission of a hearsay statement by his spouse violated his Sixth Amendment right to confront witnesses against him. He argues that the trial court erred when it concluded that a statement that Jamilah made to Officer Martinez[12] was sufficiently trustworthy to admit it. (U.S. Const., 6th Amend.) At trial, the trial court necessarily found Jamilah was an unavailable witness as to the events of July 21, 2002. (See Evid. Code, §§ 240, 1370, subd. (a)(2).) Steven had objected to this evidence, arguing that it lacked sufficient indications of trustworthiness to warrant its admission under section 1370 of the Evidence Code.[13] The trial court admitted Officer Martinez's testimony, apparently pursuant to this statute, which would have required a finding that Jamilah's statement to the officer was trustworthy.[14] (See Evid. Code, § 1370, subd. (a)(4).)

The argument set out in Steven's opening brief was based on the then-applicable reliability standard for admission of hearsay statements that had been enunciated by the United States Supreme Court in *Ohio v. Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531]. Under *Roberts,* an unavailable witness's hearsay statement could be admitted without violating the Sixth Amendment's confrontation clause if the statement bore adequate indicia of reliability—if it either fell within a firmly rooted hearsay exception or bore particularized guarantees of trustworthiness. (*Id.* at p. 66.) However, the high court recently reconsidered its ruling in *Roberts,* concluding that if the hearsay statement offered for its truth was testimonial in nature, its admission would violate the confrontation clause contained in the United States Constitution unless the defendant had had a prior opportunity to cross-examine the now-unavailable declarant. (*Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354, 1369, 1374] (*Crawford*).) As the standard for admissibility of Jamilah's statement to Officer Martinez changed after Steven's appeal was fully briefed, we asked the parties to submit letter briefs on the applicability of *Crawford*.

First, the parties agree that *Crawford* applies to this case, even though it was decided after the trial court made its decision to admit Officer Martinez's testimony. *Crawford* itself is silent on the issue of retroactivity. As a

---

[12] Jamilah's statement to Officer Martinez is set forth in part I.A., *ante*.

[13] This provision permits the admission of a hearsay statement pertaining to the infliction of physical injury on the declarant if inter alia the declarant is unavailable as a witness and the statement was made under circumstances that indicate its trustworthiness. (Evid. Code, § 1370, subd. (a)(1), (2), (4).)

[14] The possibility that the statement was admissible as a spontaneous statement was debated, as well. Although the trial court did not rule that the evidence was admissible pursuant to a particular provision of the Evidence Code, it appears that it relied on section 1370 for admission of Officer Martinez's statement.

matter of normal judicial operation, even a nonretroactive decision governs cases that are not yet final when the decision is announced. (*People v. Guerra* (1984) 37 Cal.3d 385, 399 [208 Cal.Rptr. 162, 690 P.2d 635]; *People v. Rollins* (1967) 65 Cal.2d 681, 685, fn. 3 [56 Cal.Rptr. 293, 423 P.2d 221]; see *Griffith v. Kentucky* (1987) 479 U.S. 314, 328 [93 L.Ed.2d 649, 107 S.Ct. 708] [even new rule applies to cases not yet final].) Thus, we conclude that *Crawford* applies to Steven's case, which was pending on appeal at the time that *Crawford* was announced on March 8, 2004.

■ Second, if the hearsay statement was "testimonial" in nature, its admission violates the confrontation clause unless the defendant was afforded an opportunity to confront and cross-examine the hearsay declarant. As we conclude hereafter that Steven was afforded that opportunity, it is unnecessary to determine whether the statement was "testimonial" under *Crawford* and we assume, for purposes of argument, that it was.[15]

■ Thus, we confront the pivotal issue in this case—whether the trial court's admission of Officer Martinez's testimony in order to bring Jamilah's July 2002 statement to police before the jury violated Steven's Sixth Amendment right to confront witnesses against him. Under section 1370 of the Evidence Code, evidence of a hearsay statement is nonetheless admissible if the statement narrated the infliction of physical injury on Jamilah, she was unavailable as a witness, the statement was made at or near the time of the infliction of injury, it was made to a police officer, and it was made under circumstances indicating its trustworthiness. (See Evid. Code, § 1370, subd. (a).) Four of these five requirements are clearly satisfied—Jamilah's hearsay statement to Officer Martinez recounted Steven's choking of her shortly after the incident occurred. (See Evid. Code, § 1370, subd. (a)(1)-(3), (5).) The final requirement—that the statement was made under circumstances indicating its trustworthiness—is at issue after *Crawford*. (See Evid. Code, § 1370, subd. (a)(4).) After *Crawford*, the admission of Officer Martinez's testimony of Jamilah's statement would only be consistent with the confrontation clause of the Sixth Amendment to the United States Constitution if Steven had a prior opportunity to cross-examine Jamilah. (See *Crawford, supra*, 541 U.S. at pp. 59, 68 [124 S.Ct. at pp. 1369, 1374].)

■ We must construe a statute in a manner that is consistent with applicable constitutional provisions, seeking to harmonize the Constitution

---

[15] In his letter brief, the Attorney General initially agreed with Steven that Jamilah's statement to Officer Martinez was testimonial within the meaning of *Crawford*. In a subsequent letter, the Attorney General cited two opinions of the Indiana Court of Appeals filed June 14, 2004, holding that statements to police, under circumstances similar to the case at bar, were *not* testimonial under *Crawford*. (See *Fowler v. Indiana* (Ind.Ct.App. 2004) 809 N.E.2d 960, 961–964; *Hammon v. Indiana* (Ind.Ct.App. 2004) 809 N.E.2d 945, 950–953.)

and the statute. (See *California Housing Finance Agency v. Elliott* (1976) 17 Cal.3d 575, 594 [131 Cal.Rptr. 361, 551 P.2d 1193]; *People v. Globe Grain and Mill. Co.* (1930) 211 Cal. 121, 127 [294 P. 3]; see also 7 Witkin, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 95, pp. 148–149.) Construing section 1370 of the Evidence Code along with *Crawford,* we interpret the trustworthiness prong of subdivision (a)(4) of that statute to require a prior opportunity to cross-examine the declarant. (See *Crawford, supra,* 541 U.S. at pp. 59, 68 [124 S.Ct. at pp. 1369, 1374].)

 In this matter, not only did Steven have the *opportunity* to cross-examine Jamilah at the preliminary hearing about the statement she gave to Officer Martinez, but he vigorously exercised that opportunity and later presented that preliminary hearing testimony to the jury in support of his defense. Steven's counsel relied on the facts as set out in Jamilah's preliminary hearing testimony when she made her closing argument to the jury. As we find that the evil decried in *Crawford*—the admission of hearsay statements when a defendant did not have an opportunity to cross-examine a declarant who is unavailable at trial—did not arise in Steven's case, we find that the trial court properly admitted Officer Martinez's hearsay testimony of Jamilah's July 2002 statement to him.

III., IV.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## V. EVIDENCE CODE SECTION 1109

Finally, Steven contends that admission of propensity evidence of his 2001 prior act of domestic violence denied him a fair trial. He urges us to find that section 1109 of the Evidence Code, which permitted the trial court to admit evidence of the 2001 incident to show his propensity to commit acts of domestic violence, violates his constitutional rights to due process and equal protection. He argues that the code section is unconstitutional both on its face and as applied. (See Evid. Code, § 1109; see also U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15.)[22]

---

*See footnote, *ante,* page 224.

[22] Steven asserts that two cases in which appellate courts addressed this issue are now pending before the California Supreme Court. However, the issues being considered by our state's high court in these two matters do not include the application of Evidence Code section 1109. In *People v. Taylor* (2004) 32 Cal.4th 863 [11 Cal.Rptr.3d 510, 86 P.3d 881], the issue pertains to the defendant's state of mind in a case of implied malice murder of a fetus. The court granted review in the other case Steven cites—*People v. Salinas* (review granted May 21, 2003, S115134)—and ordered briefing to be deferred until a decision is made in *People v.*

Before trial, the prosecution gave notice that it intended to offer evidence of four incidents of domestic violence, including one in 2001 that led to Steven's guilty plea to and misdemeanor conviction for inflicting corporal injury on his spouse.[23] (See § 273.5; Evid. Code, § 1109.) It also sought to admit his prior convictions for this offense for impeachment use. The trial court ruled that only evidence of the 2001 incident would be admitted. Jamilah, her mother Jacqueline Thomas and Antioch Police Officer Tara McBroom testified about the January 2001 incident at trial. The parties also stipulated to the fact of Steven's related no contest plea and misdemeanor conviction. (See pt. II.D., *ante*.)

■ In another published decision, we have already considered and rejected the federal and state constitutional facial due process challenges that Steven raises regarding the admission of propensity evidence pursuant to Evidence Code section 1109. We need not reiterate its reasoning here but merely endorse its continuing viability. (See *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1095–1097 [98 Cal.Rptr.2d 696], cert. den. *sub nom. Escobar v. California* (2001) 532 U.S. 1053 [149 L.Ed.2d 1026, 121 S.Ct. 2195]; see also *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1309–1310 [97 Cal.Rptr.2d 727]; *People v. Brown* (2000) 77 Cal.App.4th 1324, 1332–1334 [92 Cal.Rptr.2d 433].) His equal protection challenge—that Evidence Code section 1109 improperly singles out defendants accused of domestic violence and treats them differently from others accused of crimes other than sex offenses—has also been resolved in favor of the trial court's admission of this evidence. (See *People v. Jennings, supra,* 81 Cal.App.4th at pp. 1310–1313.) We find the reasoning of this decision to be sound, as well.
■ The evidentiary distinction drawn by section 1109 of the Evidence Code between domestic violence offenses and other offenses is relevant to the evidentiary purpose underlying this distinction. (*People v. Jennings, supra,* at p. 1311.)

Steven also argues that Evidence Code section 1109 is unconstitutional as applied in his case. He reasons that the evidence in his case was extremely weak because it was comprised of unreliable hearsay evidence of Jamilah's statements to police. By admitting evidence of the prior domestic violence incident, Steven contends that the trial court made the case against him artificially strong, shifting the jury's focus from the charged incident to the prior incident. He urges us to conclude that the admission of this evidence was highly inflammatory and prejudicial, denying him a fair trial. This

---

*Brown* (review granted Apr. 9, 2003, S113929, argued and submitted May 5, 2004). ■ *Brown* considers the propriety of admitting battered women's syndrome evidence without evidence of any prior domestic violence. Thus, neither the cases Steven cites nor the other domestic violence case we have found that are or were pending before the California Supreme Court involves the code section we are called on to consider.

[23] This was the only incident of the four alleged that was prosecuted.

argument is premised on his assumption that there was little admissible evidence of the July 2002 incident. In light of our finding that Jamilah's statements to Antioch police were admissible, this argument also fails. (See pt. II., *ante*.) Thus, we conclude that the trial court did not err in admitting this evidence.[24]

## VI. SENTENCING

For their part, the People contend that the trial court imposed an illegal sentence in January 2003. They also argue that the trial court executing that sentence after revocation of probation in October 2003 had no authority to impose the sentence that it did, as it deviated from that imposed in January 2003. They urge us to correct the sentence on appeal to reflect a four-year sentence.[25] Steven urges us instead to remand for resentencing—an alternative that the People also find acceptable, if we opt not to correct the sentence.

In order to understand this claim of error, we must understand what sentence was imposed but later suspended in January 2003. The various records are ambiguous in several ways. The probation report prepared for this hearing and the minute order in the clerk's transcript accurately reflect the two charges of which Steven was convicted—inflicting corporal injury on a spouse in 2002[26] with a prior conviction[27] and assault by force likely to produce great bodily injury.

The clerk's transcript of that proceeding notes that the trial court imposed a total term of three years. The minute order also breaks the sentence down into two parts—one for each offense of which Steven was convicted. With regard to the parts of the sentence that purportedly result in the total term of three years, the minutes state that the trial court imposed a midterm of four years for inflicting corporal injury on a spouse with a prior conviction and a

---

[24] Steven also contends that the cumulative effect of the multiple errors committed at trial deprived him of due process, requiring reversal of the underlying judgment even if the prejudice flowing from each individual error is insufficient alone to undermine confidence in the judgment. As we have found no error, we also reject this argument.

[25] The People did not file a cross-appeal in this matter. However, if the sentence was legally unauthorized, it can be corrected at any time. (See § 1238, subd. (a)(10); *People v. Scott* (1994) 9 Cal.4th 331, 354 [36 Cal.Rptr.2d 627, 885 P.2d 1040]; *People v. Carranza* (1996) 51 Cal.App.4th 528, 532–533 [59 Cal.Rptr.2d 134].) Thus, we assume arguendo that the People may raise this issue on appeal, despite the failure to file a cross-appeal.

[26] In 2002, the applicable sentencing statutes were substantially the same as their current versions, although some minor amendments and renumbering have occurred. (See § 273.5, former subd. (e) [now subd. (e)(1)] [Stats. 2000, ch. 287, § 5, as amended by Stats. 2003, ch. 262, § 1].) For convenience, we cite current statutory law.

[27] Steven admitted the prior conviction and the jury found him guilty of inflicting corporal injury on a spouse.

midterm of three years for assault—the latter to be stayed on multiple punishment grounds. (See §§ 245, subd. (a)(1), 273.5, subds. (a), (e), 654.) This reference in the clerk's transcript suggests a total term of four years. Read together, a total term of three years would have been the result of a midterm for a *first conviction* for inflicting corporal injury on a spouse. (See § 273.5, subd. (a).) A total term of four years would be the result if the trial court imposed the midterm for the offense of which Steven was actually convicted—one including the element of *a prior conviction*. (See § 273.5, subd. (e)(1).) Thus, the minute order is internally ambiguous about what sentence was imposed but suspended in January 2003—a three-year or a four-year term.

 Entering a judgment of the trial court in the minutes is a clerical function. Any discrepancy between the minutes and the oral pronouncement of a sentence is presumed to be the result of clerical error. Thus, the oral pronouncement of sentence prevails in cases where it deviates from that recorded in the minutes. (See *People v. Mesa* (1975) 14 Cal.3d 466, 471–472 [121 Cal.Rptr. 473, 535 P.2d 337].) Ordinarily, this principle of law would let us apply the trial court's oral pronouncement of judgment as the definitive sentence, but the sentence orally pronounced was an illegal six-year term for the assault. Again, we must examine the purported sentence imposed in some detail.

 The reporter's transcript of the January 2003 sentencing hearing suggests that the trial court operated under the misapprehension that a great bodily injury enhancement related to the assault charge had been found to be true. The trial court intended to impose a midterm for both offenses. An assault combined with an enhancement for actual infliction of great bodily injury might result in a total sentence of six years—a midterm sentence of three years enhanced by a three-year term for inflicting great bodily injury. (See §§ 245, subd. (a)(1), 12022.7, subd. (a).) In fact, Steven was convicted of an assault by force likely to produce great bodily injury—that is, great bodily injury was an element of the offense already factored into the sentence for the substantive offense, not an enhancement for which an additional term was warranted. The midterm for assault by force likely to produce great bodily injury was three years. (See § 245, subd. (a)(1).)

The reporter's transcript states that the trial court sentenced Steven to a midterm of four years for the first of the two counts—inflicting corporal injury on a spouse with a prior conviction. (See § 273.5, subd. (e)(1).) The court also purported to sentence him to a six-year term for assault—a midterm of three years for that offense and a three-year enhancement for inflicting great bodily injury—apparently based on the assumption that an

enhancement was proper. In fact, no separate great bodily injury enhancement was alleged or found to support an additional three-year term. (See §§ 245, subd. (a)(1), 12022.7.)

■ A sentence is unauthorized when it could not lawfully be imposed under any circumstances in the particular case. (See *People v. Martinez* (1998) 65 Cal.App.4th 1511, 1516–1517 [77 Cal.Rptr.2d 492].) In this matter, the trial court could not lawfully impose a three-year enhancement for great bodily injury related to the underlying term for assault without proving and pleading that enhancement. (See § 1170.1, subd. (e).) We are satisfied that the trial court's pronounced six-year term for assault was illegal.

The sentence imposed in January 2003 poses another question for us. The trial court avoided multiple punishment by staying what it thought was the shorter term—a four-year sentence for inflicting corporal injury on a spouse with a prior conviction. This decision is now suspect, given its express intent to apply the longer of the two terms and our finding that a six-year term for an enhanced assault was illegal. Before it began its formal pronouncement, the trial court concluded that if it was to stay one of the two terms for multiple punishment reasons, it would be compelled to stay the shorter term—that is, to impose the six-year sentence for assault rather than the four-year term for the other offense. (See § 654.) After finding no legal cause why judgment should not be pronounced, the trial court stated that it would impose a four-year midterm for infliction of corporal injury and a six-year term for an enhanced assault—a three-year midterm for the assault and a three-year enhancement term.

The trial court then suspended execution of the sentence it had just imposed and placed Steven on probation for five years. It advised Steven that if he violated probation, he would be sentenced to state prison for six years. It stayed sentence for inflicting corporal injury on a spouse to avoid multiple punishment. (See § 654.) Thus, the trial court chose its illegal six-year sentence and stayed the legal, longer four-year term of imprisonment. Applying its stated assumptions and imposing the legal term for assault, it appears that the trial court would have imposed a four-year term for inflicting corporal injury with a prior conviction and would have stayed the shorter three-year midterm for assault. However, we cannot be so certain of this outcome that a simple correction of the trial court's illegal sentence would be appropriate. (See *People v. Martinez, supra,* 65 Cal.App.4th at pp. 1516–1517.)

In January 2003, the sentence was imposed and then suspended. It was not until October 2003 after probation revocation that sentence was executed. A probation report prepared for the probation revocation hearing asserted that

the January 2003 sentence was a three-year suspended sentence.[28] In October 2003, after probation was revoked, Steven was sentenced to state prison for a total term of three years. The judge imposing the suspended sentence concluded that the trial court that originally sentenced Steven erroneously pronounced a four-year midterm for inflicting corporal injury on a spouse. Instead, the judge at the probation revocation hearing found that the midterm for that offense was actually three years. It imposed that three-year term for inflicting corporal injury on a spouse and stayed the three-year term for the assault in order to avoid multiple punishment.[29] (See § 654.) While three years would have been the correct term if this had been Steven's first conviction for inflicting corporal injury on a spouse, he was convicted of that offense as one who had earlier been convicted of the same charge. Instead, the four-year term would have been correct, assuming that this was what the trial court meant to impose in January 2003.

We are satisfied that after probation revocation, the trial court probably had the authority to correct an illegal sentence imposed and suspended, if it could divine what the legal sentence would have been. When a trial court revokes probation in a case in which sentence was imposed but execution of that sentence was suspended in preparation for a grant of a term of probation, the trial court after revocation of probation has no authority to reduce the imposed sentence that it then executes. (*People v. Howard* (1997) 16 Cal.4th 1081, 1084 [68 Cal.Rptr.2d 870, 946 P.2d 828].) However, an illegal sentence may be corrected whenever the error comes to the attention of the trial court or any reviewing court. (*People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6 [66 Cal.Rptr.2d 423, 941 P.2d 56]; *People v. Serrato* (1973) 9 Cal.3d 753, 763 [109 Cal.Rptr. 65, 512 P.2d 289], disapproved of on other grounds in *People v. Fosselman* (1983) 33 Cal.3d 572, 583, fn. 1 [189 Cal.Rptr. 855, 659 P.2d 1144]; *People v. Martinez, supra,* 65 Cal.App.4th at p. 1519; *People v. Colado* (1995) 32 Cal.App.4th 260, 263, fn. 1 [38 Cal.Rptr.2d 57].) Thus, the trial court after revocation, although bound to impose a legal sentence, retained the right to correct an illegal sentence in October 2003. (See *People v. Colado, supra,* 32 Cal.App.4th at p. 263, fn. 1.)

Both the sentence imposed but suspended in January 2003 and that which was executed in October 2003 were illegal. Had one or both courts sentenced him to a legal term, it is likely that Steven would have been sentenced to a

---

[28] This assertion may have been based on a mistaken assumption that Steven was convicted of inflicting corporal injury on a spouse *without* a prior conviction. (See § 273.5, subds. (a), (e)(1).) This was the jury's verdict, because Steven admitted the prior conviction element of this offense in an attempt to keep the jury from learning of this prior conviction.

[29] The reporter's transcript, clerk's minutes, and abstract of judgment are all consistent about the sentence ultimately imposed after probation revocation.

four-year term in state prison. However, as we cannot be certain what sentence the January 2003 trial court intended, we must remand the matter for resentencing.

## VII. REMITTITUR

The judgments are reversed and remanded to the trial court for resentencing. In all other respects, the judgments are affirmed.

Kay, P. J., and Sepulveda, J., concurred.

Appellant's petition for review by the Supreme Court was denied October 13, 2004.