Filed 5/19/23  P. v. Cowen CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>HENRY SIMON COWEN,<br><br>    Defendant and Appellant. | D079766<br><br><br><br>(Super. Ct. No. SCN406008) |

APPEAL from a judgment of the Superior Court of San Diego County, Kelly C. Mok, Judge.  Affirmed.

Benjamin Boyce Kington, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and Charles C. Ragland, Assistant Attorneys General, A. Natasha Cortina and Lynne G. McGinnis, Deputy Attorneys General, for the Plaintiff and Respondent.

A jury convicted Henry Simon Cowen of first degree murder.  (Pen. Code,[1] § 187, subd. (a).)  The trial court found true allegations he had

---

[1]    Undesignated statutory references are to the Penal Code.

suffered a prior serious felony conviction and a prior strike conviction under the "Three Strikes" law. (§§ 667, 668, 1170.12, 1192.7.) It sentenced him to a total term of 55 years to life in prison as follows: 25 years to life, doubled for the prior strike, plus 5 years for the serious felony prior.

Cowen contends the court: (1) violated his due process rights by admitting evidence that his mother, Isela Cowen,[2] obstructed the investigation; and (2) erroneously admitted propensity evidence under Evidence Code section 1109, thus depriving him of his due process rights under the federal Constitution. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

As Cowen does not challenge the sufficiency of the evidence to support his conviction, we summarize only those facts necessary to provide context for his contentions.

On September 20, 2019, Cowen and his girlfriend, Sabrina Lukowsky lived in a granny flat behind his mother's home in Cardiff, California. Early that day, a neighbor heard a fight and saw Cowen yelling angrily at a woman and grabbing her arm. A different neighbor heard Cowen yelling and slamming doors on September 20 and 21. Another neighbor testified that early on the morning of September 21, Cowen had a "blank stare" and was outside the granny flat.

On October 3, 2019, San Diego Sheriff's Department deputies conducted a welfare check on Lukowsky at the granny flat. Isela answered the door and mentioned her other son, but not Cowen. Isela initially denied knowing Lukowsky but when asked about the presence of Lukowsky's car in the driveway, Isela said Lukowsky sometimes delivered flowers to her. She

---

2   To avoid confusion, we refer to Cowen's mother by her first name; we intend no disrespect.

denied the deputy sheriffs access to the property. After the deputy sheriffs learned that Cowen and Lukowsky knew each other, they returned and walked around Isela's property. An odor emanated from the granny flat, and neighbors complained it might be a dead animal. A lock on the gate appeared to be new. Isela followed the deputies as they walked around the yard. She told them she would file a complaint against them.

On October 4, 2019, deputy sheriffs returned as part of a missing person investigation and asked neighbors whether they had seen Lukowsky. The deputies saw Isela, who was "very standoffish, confrontational, and uncooperative." They said a "really terrible, foul smell" was in the air.

On October 6, 2019, a deputy sheriff responded to a call regarding a foul odor at Isela's home. Isela said the smell had been intermittent for years and she believed it was from the neighbor's chicken coop. The deputy ran the plates of the car in the driveway and found out Lukowsky was the subject of a missing person report. He returned to speak with Isela, who declined to speak with him further.

On October 8, 2019, deputy sheriffs executed a warrant to search Isela's home. The smell was stronger than before, and there were flies "everywhere." The granny flat was locked with the doorknob and a deadbolt. Blood was found throughout the granny flat, including on a wall, floor, window shade, and ceiling. DNA testing showed that some of the blood was Lukowsky's. Lukowsky's body was found in a bed in the granny flat. The blood stain patterns indicated force was used. Based on a specific DNA test used to detect DNA from males, it was determined that DNA from Lukowsky's fingernail scrapings was consistent with that of a Cowen male.

A supervising medical examiner who attended the autopsy testified Lukowsky had head injuries from blunt force trauma and multiple rib

fractures that damaged her lungs.  Her hyoid bone was fractured, indicating strangulation.  The cause of death was strangulation, with blunt force injuries to the torso as a contributing factor.  The manner of death was homicide.

A forensic entomologist testified regarding the amount of time it takes, postmortem, for a body to begin to be colonized by insects.  He testified that the "infestation" of Lukowsky's body by insects likely started as early as September 24, 2019, and that the body could have been available for "infestation" as early as September 21, 2019.

In late September 2019, Cowen went to the Israeli consulate in Los Angeles to seek a visa in order to travel to Israel quickly.  However, he learned the visa process would take approximately six months.  For several days after the murder, the sheriff's department did not know Cowen's whereabouts.  They finally arrested him in Riverside, California on October 11, 2019.

Cowen testified at trial regarding an altercation he had with Lukowsky starting on the night of September 20, 2019, and continuing into the next day.  He stated Lukowsky drank two bottles of wine and became upset because he was planning to travel to Los Angeles the next day.  He stated she threatened to kill him for leaving her, and repeatedly hit him in the head with a wine bottle.  In response, he "started throwing defensive strikes."  At one point, Lukowsky threatened to kill him and reached to cut his throat with a broken champagne bottle.  Cowen "threw a right-hand punch. Immediately deadly force."  His blow landed on her neck.  She collapsed on him and he lost consciousness for a while.  When he recovered, Lukowsky never said anything further to him.  He did not check on her before leaving

4

for Los Angeles on the afternoon of September 21, 2019. He did not try to contact her from Los Angeles.

## I. *Testimony About Isela's Statements and Conduct*

Cowen contends the challenged evidence of Isela's statements and conduct that impeded the investigation were irrelevant: "The bare assertion that [Isela's] actions caused the 'investigation [to take] the course that it did' does not demonstrate relevance." He adds that even if minimally relevant, under Evidence Code section 352, the evidence was substantially more prejudicial than probative. Cowen contends the court's instruction to the jury did not cure the court's error, and that the prosecutor's argument in a pleading emphasized that Isela's behavior was "highly suspicious." He concludes, "If a trained prosecutor could not properly compartmentalize the evidence, neither could the jurors."

### A. *Background*

Before trial, the prosecution moved to admit Isela's "multiple odd statements that affected the law enforcement listeners, and influenced the direction of the investigation"; specifically, that Isela initially denied knowing who Lukowsky was, said the foul odor was chicken feces from the neighbor's house, denied law enforcement entry to the property, and "her general uncooperative demeanor." The prosecutor argued the statements were not inadmissible hearsay because they were not admitted for the truth of the matter: "[Isela's] statements and behavior towards the deputies was highly suspicious, many of her statements were demonstrably false, and therefore not offered for the truth. [Her] statements to law enforcement as well as her uncooperative and suspicious conduct is not offered for the truth either, but for the effect on the listener law enforcement officers that caused the

5

direction of the investigation that culminated in a search warrant being executed at [her] home."

Defense counsel objected that Isela's statements were hearsay and inadmissible because she was unavailable to testify.

The trial court admitted the evidence as "relevant for the jury to hear why this investigation, when it started October 3rd, took so long to actually obtain a warrant to actually get into the house." The court explained, "And the officers and detectives, they didn't go in and obtain any warrant to actually go into the house, even with the smell, but then the fact that [Isela] said it was the chicken coop or the chicken feces, and to go to that state of mind regarding how they proceeded in their investigation. But it would be very limited in terms of what [Isela] said."

Defense counsel conceded: "I think that [Isela's] statements and conduct did contribute to possibly a delay in investigation, so I understand that. My primary concern is that since she is his mother, that her adverse behavior would be somehow interpreted as implying guilt to my client [sic]. [¶] . . . I understand that's connected to the investigation. I think that a curing instruction that all of that should not impugn [sic] guilt to my client."

Before the first law enforcement witness testified about Isela's behavior, the trial court instructed the jury as follows: "[Y]ou may hear some testimony regarding statements and conduct of Isela [ ]. If it is presented to you, . . . it is presented to you solely to explain the delays in the investigation of this case. [¶] You are not to consider [Isela's] statements or conduct when evaluating [Cowen's] innocence or guilt in this case."

B. *Standard of Review and Applicable Law*

" ' "A trial court has 'considerable discretion' in determining the relevance of evidence. [Citation.] Similarly, the court has broad discretion

6

under Evidence Code section 352 to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects." ' [Citation.] Evidence is relevant when it ' " 'tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' " ' [Citation.] We review the trial court's evidentiary decision for abuse of discretion, disturbing it only if we conclude that the trial ' " ' " 'court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " ' " (*People v. Parker* (2022) 13 Cal.5th 1, 53; *People v. Young* (2019) 7 Cal.5th 905, 931.)

"Evidence is not prejudicial, as that term is used in [the Evidence Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice." (*People v. Doolin* (2009) 45 Cal.4th 390, 438-439.) Evidence is unduly prejudicial when "it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction." (*Id.* at p. 439.) " ' "The 'prejudice' which [Evidence Code] section 352 seeks to avoid is that which ' " 'uniquely tends to evoke an emotional bias against the defendant as an individual *and which has very little effect on the issues*.' " ' " ' " (*People v. Parker, supra,* 13 Cal.5th at p. 54.)

C. *Analysis*

The relevance of testimony regarding Isela's statements and conduct was that it filled gaps in the evidence regarding the sheriff department's investigation. Deputy sheriffs went to Isela's home at different times before gaining access to the granny flat. Despite the offensive odor that emanated

7

from the property, and the complaints of neighbors about it, Isela offered them an explanation for it and told them she would report them for walking around her property. The exclusion of the challenged testimony could have left doubts in the jurors' minds about the deputy sheriffs' competence in conducting the investigation.

Under Evidence Code section 352, the challenged testimony was more probative than prejudicial. It was not the kind of evidence that would inflame the jury against Cowen. Moreover, this case did not turn on the statements or actions of Isela in the weeks after the murder, but rather on Cowen's actions around the estimated date of her murder, as the evidence from Cowen, the neighbors and the medical examiner showed. Cowen's own testimony placed him at the scene of the crime at the relevant time, and implicated him in Lukowsky's death. The jury could easily separate Isela's obstruction of the sheriff's department's investigation from Cowen's actions in killing Lukowsy. We point out defense counsel conceded at trial that Isela's statements and conduct did contribute to possibly a delay in investigation, and counsel sought a limiting instruction, which the court gave. "Any prejudice that the challenged information may have threatened must be deemed to have been prevented by the court's limiting instruction to the jury. We presume that jurors comprehend and accept the court's directions. [Citation.] We can, of course, do nothing else. The crucial assumption underlying our constitutional system of trial by jury is that jurors generally understand and faithfully follow instructions." (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.) We conclude the trial court's decision to admit testimony regarding Isela's statements and conduct was not arbitrary, capricious, or patently absurd.

## II. *Propensity Evidence*

Cowen contends the court erroneously admitted evidence of prior acts of domestic violence under Evidence Code section 1109.

### A. *Applicable Law*

Evidence Code section 1109 expressly incorporates Evidence Code section 352, so evidence of past domestic violence is inadmissible only if the court determines that "its probative value is substantially outweighed" by its prejudicial impact. (Evid. Code, § 352.)

"[A] defendant's propensity to commit domestic violence against a former girlfriend who was murdered . . . is relevant and probative to an element of murder, 'namely, [a defendant's] intentional doing of an act with malice aforethought that resulted in the victim's death.' [Citation.] A defendant's pattern of prior acts of domestic violence logically leads to the inference of malice aforethought and culpability for murder." (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1237.)

### B. *Background*

Over Cowen's objection, the trial court admitted evidence of Cowen's prior acts of domestic violence under Evidence Code section 1109. Specifically, the court ruled: "All those incidents that allege to have occurred between [ ] Cowen and [Lukowsky] I do believe [are] relevant and admissible to show the circumstances surrounding their relationship . . . those incidents can go to motive. However, the 2008 incident [involving strangulation of N.G.] will not be argued for either motive or identity, but it may be argued for propensity."

Based on the court's ruling, two individuals testified that in September 2019, they saw Lukowsky was wearing dark glasses and makeup around her

9

eyes, apparently to cover bruising. She also was quiet and did not engage with anyone.

N.G., Cowen's previous girlfriend, testified he strangled her in 2008: "[H]e jumped on top of me, and so I fell backwards. And I couldn't get him off of me. He's much larger than I am. He had both hands on my neck, and I couldn't get him off. I couldn't make any noise. And so I started banging on the wall to try to get my roommate's attention."

The court instructed the jury that if the People proved these prior acts by a preponderance of the evidence, it could "consider that evidence and weigh it together with all other evidence received during the trial to help you determine whether [Cowen] committed [m]urder [.]"

The prosecutor argued in closing that Cowen was simply the type of person who commits domestic violence: "I'm not the kind of person who quotes and cites people because I'm just not that smart, but I like this one: When someone shows you who they are, believe them the first time. It's Maya Angelou. [N.G.] did." The prosecutor added, "There's one more piece of proof this was strangulation. He's done it before."

C. *Analysis*

Cowen contends that the court's use of propensity evidence under Evidence Code section 1109 violated his due process rights under the federal Constitution; however, he concedes the California Supreme Court rejected his position in *People v. Falsetta* (1999) 21 Cal.4th 903 (*Falsetta*). He raises the issue to preserve it for review in federal court.

In *Falsetta, supra,* 21 Cal.4th 903, the California Supreme Court rejected a constitutional due process challenge to Evidence Code section 1108, a parallel statute to Evidence Code section 1109, which applies to prior sexual offenses rather than prior domestic violence. The reasoning in

10

*Falsetta* has been applied by appellate courts to reject similar constitutional due process challenges to Evidence Code section 1109. (See *People v. Brown* (2000) 77 Cal.App.4th 1324, 1329; see also *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1024; *People v. Johnson* (2000) 77 Cal.App.4th 410, 412; *People v. Jennings* (2008) 81 Cal.App.4th 1301, 1310 ["In short, the constitutionality of [Evidence Code] section 1109 under the due process clauses of the federal and state constitutions has now been settled"]; *People v. Price* (2004) 120 Cal.App.4th 224, 240-241; *People v. Reyes* (2008) 160 Cal.App.4th 246, 249-253.)

As recognized in caselaw, the legislative history of Evidence Code section 1109 acknowledges the special nature of domestic violence crime: " 'The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked. If we fail to address the very essence of domestic violence, we will continue to see cases where perpetrators of this violence will beat their intimate partners, even kill them, and go on to beat or kill the next intimate partner. Since criminal prosecution is one of the few factors which may interrupt the escalating pattern of domestic violence, we must be willing to look at that pattern during the criminal prosecution, or we will miss the opportunity to address this problem at all.' (Assem. Com. Rep. on Public Safety (June 25, 1996) pp. 3-4.) Moreover, the special nature of domestic violence cases is legislatively recognized in enactments such as the Law Enforcement Response to Domestic Violence, sections 13700 through 13731. [¶] Based on the

11

foregoing, the California Legislature has determined the policy considerations favoring the exclusion of evidence of uncharged domestic violence offenses are outweighed in criminal domestic violence cases by the policy considerations favoring the admission of such evidence." (*People v. Johnson, supra,* 77 Cal.App.4th at pp. 419-420.)

Cowen has not explained how the propensity evidence introduced at trial was more prejudicial than probative so as to constitute an abuse of discretion. As stated, it is well established that "prejudice" is not synonymous with "damaging." (*People v. Chhoun* (2021) 11 Cal.5th 1, 29.) Further, "[t]he potential for prejudice is decreased, . . . when testimony describing the defendant's uncharged acts is no stronger or more inflammatory than the testimony concerning the charged offense." (*People v. Tran* (2011) 51 Cal.4th 1040, 1047.) In light of the fact that the propensity evidence introduced was probative, and neither as strong or more inflammatory than the testimony concerning Lukowsky's death by strangulation, and in light of the court's curative instructions to the jury regarding propensity evidence, we conclude the trial court did not abuse its discretion in admitting the challenged evidence under Evidence Code sections 1109 and 352.

## DISPOSITION

The judgment is affirmed.

O'ROURKE, Acting P. J.

WE CONCUR:

DATO, J.

DO, J.