Filed 8/7/13  P. v. McFadden CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

EMANUEL EDWARD MCFADDEN,

    Defendant and Appellant.

E055069

(Super.Ct.No. FBA1100054)

OPINION

APPEAL from the Superior Court of San Bernardino County.  Victor R. Stull, Judge.  Affirmed with directions.

Richard Jay Moller, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Seth Friedman, Peter Quon, Jr., and Theodore M. Cropley, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant, Emanuel McFadden, of inflicting corporal injury on a cohabitant (Pen. Code, § section 273.5, subd. (a)).[1]  In bifurcated proceedings, the trial court found true allegations that defendant had suffered two strike priors (§ 667, subds. (b)-(i)) and six prior convictions for which he served prison terms (§ 667.5, subd. (b)). He was sentenced to prison for 25 years to life plus four years and appeals, claiming the trial court should have granted his requests for substitution of counsel, evidence of prior acts of domestic violence should have been excluded and his request to dismiss one or both of his strike priors should have been granted.  We reject his contentions and affirm, while directing the trial court to correct an error in the abstract of judgment.

## FACTS

The victim testified as follows: As of January 23, 2011, she had been defendant's cohabitating girlfriend for seven months.  Sometime after noon, she was sitting on the couch in the living room with defendant's minor nephew when an acquaintance came to the door, asking for a cigarette.  She awoke defendant, who was sleeping in their bedroom, and told him about the request.  After the acquaintance left, defendant entered the living room, grabbed the bowl of noodles she was holding and hit her on the back of the head with it, breaking the bowl, while saying, "Bitch, you disrespected me."  The victim responded with cussing.  Defendant punched the victim from her face to her chest. The victim got off the couch and defendant pulled her down the hallway to the bedroom by her hair, pulling out her extensions, while continuing to punch her because she had

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

2

tried to run away. The victim did not fight back, but pulled herself into the fetal position after falling on the bed while defendant continued to punch her and pull her hair. The victim rolled onto the other side of the bed and got up, but defendant came over and continued to punch her. He hit her with a "door rail" or dowel on the shin and stomach. He also choked her. She ran out of the house and across the street, but defendant caught up with her, grabbed her and said, "Bitch, get your ass back in the house." She went back inside and defendant beat her and his nephew. She told his nephew to call the police. Defendant hit her face and body, opening up one of the stitches she had received earlier in the day above her eye. Defendant went into the living room where his nephew was on the phone with the police, asked his nephew if the latter had called the police and when the nephew said he had, defendant ran into the bedroom, changed his shirt and left the house. The victim verified that the defendant had inflicted the injuries that were depicted in pictures of her taken by the police when they arrived. She also identified pictures taken at the scene that depicted her hair extensions on the floor of her home. She told the police who arrived what defendant had done to her, including punching her, cutting her above the eye and hitting her with a stick. After the police left, defendant returned to the home, but the victim hid from him in the closet. Defendant screamed the victim's name, but she did not come out. Defendant's nephew called the police again, but by the time they arrived, defendant had left.

The victim kept in contact with defendant after he was arrested, talking to him on the phone and writing him letters. During one of those calls, in late January or early February, a recording of which was played for the jury, defendant told the victim that if

she did not cooperate, the police and the prosecutor had nothing to use against him and "[i]t could be beat . . . if my witnesses don't come." In another call, around the same time, the victim repeated back to defendant what he had told her about there being no case if there were no witnesses. Defendant told the victim that she could not come to court and she could not be forced to testify against him—that she could be threatened with being taken to jail, but the most time she would get would be 30 days. The victim reported to defendant that she was trying to get some third person to get defendant's nephew out of the area and "just chill. Defendant instructed the victim to get the paperwork for the nephew and take him out of school. She testified that she understood this to mean that she and defendant's nephew should not show up for trial. Defendant commented that the pictures the prosecutor had (presumably of her injuries) were bad for his case. Defendant instructed the victim to say that she got her injuries on the railroad tracks which would leave law enforcement and the prosecutor's office with nothing. He told her that she should forgive and forget the injuries that were inflicted on her on the 23rd. He urged her to go to the police station and claim that she had filed a false report against him and she forced his nephew to say what the latter had said about the incident. She agreed to do the latter. At the end of the call, she and defendant exchanged "I love you"s.

She testified that defendant instructed the victim to drop the charge against him and she wanted to protect him because she still loved him. At the preliminary hearing, she said the injuries she sustained on January 23rd occurred when she fell on the railroad

4

tracks while intoxicated. She lied and said that defendant had not hurt her on that day in order to help him.

On March 3, 2011, she told a defense investigator the same story about falling on the railroad tracks. She lied when she told the investigator that a friend[2] had picked her up by the tracks, taken her to the hospital and returned her home, where she used drugs and drank. She lied when she told the investigator that after the acquaintance who came to the door looking for a cigarette had left, she had lost control, called defendant a son of a bitch, threw defendant on the couch and started tearing up the house. She also lied when she told the investigator that she had gotten mad at defendant because he had gotten out of bed to talk to the acquaintance who came to the door looking for a cigarette, but defendant would not get up to drink with her.

She testified that she had written a letter to the Public Defender's Office, which was introduced into evidence. In the letter, she repeated the above-mentioned story, adding that she grabbed defendant while going crazy, yelling and screaming and punching the walls. She wrote that she and defendant yelled back and forth, defendant told her to calm down and take her medications for bipolar disorder and schizophrenia and defendant's nephew called the police and reported that defendant was beating the victim even though he wasn't. She said in the letter that defendant's nephew had anger problems and had gotten mad at defendant for the latter not letting him play with the Play Station. She also said in the letter that the nephew had said that he was going to get

---

[2] This turned out to be the same person who had actually taken her and defendant to the hospital earlier that day.

5

defendant out of the house, the nephew had a habit of lying, which was documented in his medical records, and she was removing the extensions from her hair which is why they were all over the house.

At trial she testified that this letter contained lies, she had written it to cover for defendant and a woman who eventually testified at trial for the defense had helped her write it.

She testified that she was bipolar, schizophrenic, had a heart condition and was not taking her medications on January 23. She admitted that she had changed her story three or four times. She also admitted that on numerous occasions, she had filed false domestic violence police reports against her mother, ex-husband, sister and son when she was a crack addict. She testified that she had told a sheriff's deputy in May 2011, that defendant's sister had threatened to "whoop [the victim's] ass" concerning this case. She denied telling defendant's nephew what to say, even though, at the beginning, she told him not to say anything.

A recording of an interview the victim had with the police after they arrived at her house the first time on January 23, 2011 was played for the jury. In it, the victim said that defendant beat her. She admitted that she had anger problems and a rap sheet. She also said that defendant was very violent and was known to shoot people, so she was afraid to go to court. She said that a few days prior, defendant had scratched her neck, but January 23 was the first time he had actually beaten her to the extent he did. She reported that defendant used a stick on her, threw a bowl and broke it and choked her because she "met a tall guy who wanted a cigarette." She said that defendant had

6

dragged her to the bedroom, beaten her while she was on the bed and she rolled over but he went to the other side of the bed and continued to beat her, she ran out the door while defendant was talking to his nephew, but defendant caught up with her, grabbed her by the hair and returned her to the house.

The officer who arrived at the victim's home testified that he got there around 8:00 p.m. and the victim was upset and she muttered and cried. There was a cut above her eye, and some stitches that were there had been pulled open. She had injuries that were documented in photographs that were shown to the jury. Bits of hair were in the living room, kitchen, hall and bedroom. A broken bowl was in the living room and a dowel was on the couch near the bowl. There was what appeared to be blood in the bedroom.

Defendant's nephew testified that after the acquaintance who wanted the cigarette left, defendant began beating the victim's face with his fist in the living room. The victim screamed, cried and told defendant to stop and the nephew also told him the same. Defendant threw the bowl of noodles on the victim's head as she lay on the floor, breaking the bowl. He also punched the victim in the head. Defendant pulled the victim by her hair down the hall into the bedroom, causing some of her hair to come out. Defendant and the victim yelled at each other. The victim ran out the bedroom door, defendant told her to get back inside, then she ran out the front door. Defendant chased the victim and returned her to the bedroom, with his hands on her shoulders, while kicking her in the leg. While they were in the bedroom, the nephew called the police as directed to by the victim. When defendant found out that his nephew had called the police, he ran out the back door of the home. The nephew called the police a second time

7

after defendant had returned to the home, unsuccessfully tried to get in through the back and front doors, and then entered through a window. Once inside, defendant saw his nephew, who was again on the phone to the police, and he asked him why he "kept" calling the police. This time, defendant left through the front door before the officers returned to the home.

Evidence was introduced that defendant had suffered a conviction in 2000 for misdemeanor domestic battery and another in 2010, the latter involving his ex-wife.

A woman and her husband were the only two witnesses to testify for the defense other than defendant. She testified that she tried to put extensions in the victim's hair on either January 22nd or 23rd, but the victim pulled them out, leaving them on the floor, because she wanted other extensions. This witness's husband testified that he took the victim to the hospital because she had an injury to her right eye, then he took defendant to the hospital and they waited until the victim was released, then he returned both to their home. He testified that the victim told him that she had fallen on the railroad tracks. He claimed that the victim had offered him money for his testimony, but he admitted that he did not know whether she wanted him to testify for or against defendant.

Defendant testified that the man who came to the home on January 23 was not welcome because he supplied the victim with drugs. After the man left, defendant told the victim that a "ho was going to be a ho." Defendant claimed that both he and the victim had consumed drugs the day before and he had "smoked a loom" that day. The victim called defendant a mother fucker, threw the bowl of noodles at him and he threw the bowl back. She then pulled him onto the bowl and they struggled. He denied hitting

8

her face with his fist. Defendant told the victim to go to the bedroom. While there, both got physical, but he denied beating the victim on the bed, pulling her hair or hitting her with the dowel. The victim ripped defendant's shirt, so he changed it. Both yelled and called the other names. He left the home when the police were called because he was on parole. When he returned to the house, he went in through the window because no one would answer the door. His nephew was on the phone to the police, so defendant left again. He returned to the home later, eventually was reunited with the victim and spent the night at the house and part of the next day until he was arrested there. He admitted that he did not tell the police when they interviewed him the day he was arrested that the victim had thrown the bowl at him[3] or that the two had struggled with each other. He denied engaging in the assaultive acts the victim and the nephew had testified he had committed. He admitted grabbing the phone from his nephew the second time the latter called the police and hanging it up. He admitted telling the victim during one of their recorded jail calls that his nephew should be moved and that if there were no witnesses, there would be no case against him and it would be dismissed. During one of the calls, the victim apologized to defendant for allowing the acquaintance who had wanted the cigarette into the home, saying it was disrespectful to defendant. Defendant admitted that he had gotten mad when the victim let this man in the house and had called the victim a bitch and a "ho." He also admitted telling her during a call to say that she had gotten her injuries on the railroad tracks and that she should forgive and forget. He admitted that in

---

[3] During the People's rebuttal case, the police officer who arrested defendant testified that defendant did not tell him that the victim had thrown a bowl at him.

9

the recorded calls that were introduced into evidence, he had not confronted the victim about throwing the bowl at him. He also admitted that during the calls he had said "no witnesses, no case" and that they had discussed getting rid of his nephew. Defendant was impeached with prior convictions for domestic violence.

Other facts will be disclosed as they are relevant to the issues discussed.

## ISSUES AND DISCUSSION

### 1. *Defendant's Requests for Substitution of Counsel*

Trial counsel for defendant began representing defendant on February 1, 2011. On May 13, 2011, both sides declared that they were ready for trial. On May 16, 2011, the first day of trial, motions in limine were heard and voir dire was conducted. On the second day of trial, May 17, 2011, defendant requested a *Marsden*[4] hearing, during which he complained that his attorney: 1) spoke to him for the first time the previous day, 2) did not want defendant to testify, 3) did not tell defendant that defendant's ex-wife was going to testify against him, 4) had not given defendant "paperwork" concerning trial witnesses, 5) never "took" defendant's statement about the offense, 6) failed to bring in men from Las Vegas who had allegedly been lied to by the victim, and 7) had not filed any motions of which defendant was aware.[5] Defendant also asserted that he, defendant, was not "ready for trial." Defendant explained that he wanted motions concerning his ex-wife's violence towards him filed. Defendant said he would "have to go pro per." Defendant

---

[4] *People v. Marsden* (1970) 2 Cal.3d.118.

[5] However, the previous day, counsel had filed a response to the People's written motion to admit evidence under Evidence Code section 1109.

asserted that when he told the defense investigator that it was not the victim who called 911 to report the offense, but his nephew, the investigator got mad and walked out on him. He also accused the defense investigator of offering the victim $20,000 to testify against him. He claimed that both she and defense counsel had stopped talking to him. Defendant disclosed that he had letters from the victim in which the latter made statements about the offense and apologized for making allegations against defendant.

Defense counsel responded that his investigator had spoken with defendant "almost every time" defendant had appeared in court and had updated defendant each time.[6] As to the men in Las Vegas, counsel reported that one was in prison and the other was dead. He asserted that his investigator had conducted interviews of the witnesses the defense intended to call at trial and had had several interviews with the "supposed victims in this case."[7] He said that the defense had reports that defendant's ex-wife claimed that defendant had assaulted her and that she had threatened defendant with domestic violence and was on probation for that. He reported that three people had claimed to be victimized by either the victim or defendant's ex-wife and all three were scheduled to testify for the defense. However, if the trial court admitted evidence of the victim's past acts of violence, the court would allow in evidence of defendants' past acts of violence. Counsel had advised defendant not to testify, but he admitted that he could not stop defendant

---

[6] While represented by trial counsel, defendant was in court, up to that time, on 12 separate occasions.

[7] We assume he was including defendant's ex-wife, as there was only one victim in the case.

11

from doing so.  He reported that neither he nor his investigator knew until the day before that defendant had letters from the victim, he had not yet seen them and defendant had admitted to him failing to tell the defense investigator about them.

The trial court explained to defendant that evidence could be admitted about defendant's past acts that bear on his veracity should he testify, including crimes involving theft and violence.  The court also explained that the victim and defendant's ex-wife could be impeached with their prior bad acts without defendant being impeached with his if he did not testify.  However, if the defense presented evidence about prior acts by the victim and/or the ex-wife to show that they were violent, then evidence of defendant's prior acts of violence could come in.

When defendant said he wanted two particular witnesses to testify to past violent acts by the ex-wife, defense counsel responded that he wanted to keep the evidence concerning the ex-wife at a minimum.

Defendant repeated that he was not ready for trial, that he wanted to fire his attorney and go "pro per" so he "could look these things up."  Defendant said if the court would grant a two month continuance, he would want his attorney to talk to him and bring him the statements of all the witnesses.  After defendant admitted that he had not shown the letters from the victim to his attorney until the day before (despite the fact that he had been receiving them "practically every day" since the day he was arrested), counsel said, "I have difficulties continuing to represent [defendant]."  Counsel advised the trial court, if it was inclined to grant defendant's *Faretta* motion, to warn defendant that he was going up against a good attorney, i.e., the prosecutor.  Defendant accused his

12

attorney of improper representation based on the defense investigator's and his attorney's representations that he probably would not be convicted of a felony and a prior defense investigator telling him that, given the victim's "history," the case probably would not go to trial but if the prosecutor wanted to press it, "let her." The trial court pointed out to defendant that the investigator and his attorney had the right to share with him their evaluation of the case.

The trial court denied defendant's request to relieve counsel, saying that counsel had been providing defendant with adequate representation, there was no irreconcilable conflict between them and "no substantial impairment" of the attorney/client relationship. The court offered that if, based on the letters from the victim, counsel wanted a continuance, the court would grant it, however, what witnesses to call and how to cross-examine witnesses and other tactical decisions were matters for counsel to make. The court then denied defendant's request to represent himself.

Later that day, in response to the trial court's inquiry whether defendant wanted to renew his request to represent himself, defendant said he did, adding that he was not ready for trial—that he had "things to study." The trial court pointed out that if it granted defendant self-representation, there would be no continuance—that he could "study things" as trial progressed. The court gave defendant the *Faretta* form, but defendant refused to sign it. The court warned defendant of the pitfalls of self-representation, adding that if defendant continued to be represented by counsel, it would be by his current attorney. Defendant responded that he was not capable of representing himself. The trial court denied his *Faretta* motion.

Two days later, defendant again requested to represent himself, accusing the defense investigator of telling him that he was going to be convicted of a felony. Defendant asserted that he refused to go to trial "with these people." Defendant then clarified that the defense investigator had told him that if he contacted his ex-wife, he was guilty of a felony. At this point, a second *Marsden* hearing took place.

At that hearing, the defense investigator told the court that defendant had told her that he had written a letter the night before to his ex-wife and the investigator told defendant that that could be viewed as an attempt by him to intimidate a witness, which was a felony, and he should not do this. The trial court echoed these sentiments. When defendant interrupted the trial court, the latter told defendant to "[s]hut up" and defense counsel echoed that sentiment. Defendant then accused either the trial court, counsel or both of "railroading" him through trial. He added that he was on "psyche meds." The trial court asked defendant if he wanted to represent himself. Defendant repeated that he was going to get "railroaded." He added that he needed a new attorney. The trial court denied his motion to relieve counsel "[f]or the same reasons . . . expressed" when the first such motion was denied and his motion to represent himself was denied as untimely. The court then apologized to defendant for telling him to shut up.

Over the rest of that day and the first part of the next court day, the People presented most of their case in chief and the parties discussed jury instructions. After the noon recess the second day, defendant said that he had asked to talk to his attorney, but the latter had told defendant to eat his lunch. Defendant said that his attorney had not seen him or "counseled him on anything." Defendant repeated that he was rushed into

14

trial, that defense counsel "did not file anything for witnesses for me" and he was being railroaded. Defendant admitted that the defense investigator had talked to him the previous day (which was a Sunday). Defense counsel said the conversation had lasted two hours—defendant said it lasted 15 minutes and he was told nothing other than that he was going to testify and they "do things to get an appeal." Defendant told counsel that he was fired and that he was getting railroaded. He appeared to accuse the prosecutor of coercing his nephew, who testified against him. The court said defendant had not given it a reason to excuse counsel, who would continue to represent defendant. Defendant then said that he and his attorney had a disagreement. When defendant asserted that neither his attorney nor the defense investigator had listened to his version of the crime, the court held a third *Marsden* hearing.

At the hearing, defense counsel denied defendant's accusation that he did not know defendant's side of the story. Counsel asserted that defendant had told him things that, in counsel's opinion, made it impossible for defendant to testify. Counsel said he had sent his investigator to the jail the day before to discuss with defendant what defendant planned to say on the stand and had discussed this information with his investigator after her meeting with defendant and that morning. Counsel said that he had advised defendant that nothing defendant planned to say on the stand would help defendant. Counsel reiterated that he could not stop defendant from testifying. Defendant launched into another complaint about not having a "motion hearing to see the evidence that's been up against me" and not having any paperwork or knowing any witness's statements. Defense counsel repeated that during almost each of defendant's

15

court appearances, defendant had met with him or the defense investigator and any reports were read to defendant. Defendant interrupted counsel, saying, " . . . [Y]ou're fired! You're fired! [¶] I want to represent myself. You can't make me keep him. It's my right to fire him." The trial court reminded defendant that they were in the middle of a trial and denied his motion for self-representation as untimely. Defendant demanded that the court force defense counsel to turn over to it the written report of defendant's version of the crime and the court declined, saying counsel did not need to have a written report, as long as he knew defendant's version of the events. Defendant responded that he had not told his attorney anything. The trial court then denied defendant's request to discharge counsel and to represent himself, the latter because it was untimely. Soon thereafter, the People rested their case-in-chief.

The next day, the defense presented its case and the prosecution presented its rebuttal. The following day, arguments were presented, the jury was instructed and the jury deliberated and returned a verdict of guilty. During the next court day, the trial court found true all the allegations concerning defendant's prior convictions.

About a month later, defendant made his fourth *Marsden* motion. Defendant said his attorney did not cross-examine one of the witnesses against him. He asserted that counsel did not call a particular witness who would have testified to the afore-mentioned witness's "psychological problem and his ability to recount things." He added that this latter witness would also testify that she was either threatening the victim "not to come to court on [defendant]" or was threatened by the victim. He also said he wanted the psychologist of the first mentioned witness called. He criticized counsel for not making

16

an opening statement. He said counsel did not question a police officer about the difference between his testimony about moving a stick the victim said defendant had used to beat her from one room to another and what the officer had said about it in his report. He also accused the same officer of "coercing" the victim by asking her at the scene of the crime leading questions about what had happened, implying that counsel should have asked the officer about this. He said that defense counsel did not ask some questions defendant wanted asked, but defendant did not specify what they were. He asserted that the way counsel questioned him did not allow him to get his version of events out. He claimed that after he complimented counsel on the way the latter had cross-examined the victim, counsel told the victim, "Fuck you." He said that counsel was aware that the victim was threatening defense witnesses to not come to court, but he did not bring that to the jury's attention. He also accused the prosecutor of offering the victim $6,000 for convicting him, about which counsel should have questioned the victim. He felt his attorney should have brought a motion to exclude pictures of the victim's wounds. Defendant asserted that the wounds were self-inflicted. He said counsel should have cross-examined the victim about her history of violence and drug abuse. He reasserted that counsel and the defense investigator had told him that they did not believe he would be convicted of a felony. Finally, he said that his attorney told the prosecutor that defendant was guilty, but was pretending to be innocent.

Defendant's attorney explained that he did not cross-examine a particular prosecution witness because he feared more damaging information to defendant coming in as a result of it. He did not give an opening statement at the beginning of trial because

17

the victim had given several different accounts of the crime and counsel had no idea what she was going to testify to on the stand. Counsel did not give an opening statement at the beginning of the defense case-in-chief because he did not know to what defendant was going to testify. Concerning cross-examining the officer about the movement of the stick, counsel said that the victim had moved the stick and he did not recall if the stick was placed where it was when it was photographed, or the victim placed it there or the officer. Moreover, it was not an important point. Counsel said he had no information, other than defendant's accusation, that the officer had coerced the victim. Counsel admitted that defendant wrote him notes during trial, which counsel read, but he did not recall that defendant asked him to ask particular questions. As to counsel's redirect examination of defendant following his cross-examination by the prosecutor, counsel said that, in his opinion, defendant performed very poorly during cross-examination and he did not want to create more opportunities for the prosecutor to undermine defendant's testimony. Further, although defendant wanted counsel to bring out the victim's history of violence, he made a tactical decision to avoid it so defendant's history of violence would not be brought out. Counsel admitted telling defendant "Fuck you" when defendant complimented him on his cross-examination of the victim. As to the $6,000 that was supposedly offered to the victim for her testimony against defendant, counsel said that there were discussions about compensating the victim for her medical bills by the Victim's Compensation Board, and the victim commented in letters to defendant that this money would not make her not love him and the issue was covered during her testimony. Counsel denied failing to cross-examine the victim about her drug use—he

18

asserted that there was plenty of evidence about the fact that she was a "crack head," a matter with which the trial judge agreed. Counsel said he was careful to cross-examine her about her history of making false reports, but not about her history of violence, as it would open the door to evidence of defendant's history of violence coming in. Counsel stated that contrary to defendant's representation to the trial court, one of the defense witnesses had testified that he had been threatened by the victim. As to another defense witness, she did not tell the defense that she had been threatened by the victim until she had concluded her testimony. However, she performed so poorly on the witness stand that counsel did not believe it would have helped defendant to bring her back and question her about it. Counsel did not recall making a statement to the prosecutor that defendant was guilty but pretended to be innocent. He explained that although he told defendant that defendant might end up with a misdemeanor conviction because of the two assaults defendant perpetrated on the victim the day of the crime, defendant had been charged only for the later assault, during which no injuries occurred. Counsel listed the legal matters he discussed with defendant and explained his trial strategy. As to communication between them, counsel observed that defendant was difficult, does not listen well and hears things the way he wants to hear them. Counsel added, "[Defendant] is not receptive to hearing opinions contrary to his own. I have known [him] from other cases [in which he represented defendant] for probably 15 years. Unfortunately for [defendant] this is the first [case] we did not get through with at least some success." Counsel reasserted that defendant had been given updates every time he made an appearance before trial and had been told that it could not be guessed how the jury

19

reacted to the victim's testimony. Additionally, defendant was told that his nephew posed a large problem to the defense, and the letters and phone calls concerning his nephew "hurt [defendant] probably more than his own testimony did." Counsel said he moved the pretrial process along so as to avoid the prosecutor charging defendant with two counts of violating section 273, rather than one, and this was explained to defendant by either counsel or the defense investigator. As to the letters between defendant and the victim, counsel said he believed that they could be used as evidence of a conspiracy between the two and that defendant was attempting to keep his nephew from testifying, and the victim was confirming her desire to help defendant do that. In his opinion, the letters did not contain evidence that the victim had lied to the police about the events of January 23, 2011. Counsel said that nothing defendant had said about him impacted his ability to represent defendant.

The trial court concluded that based on what it had observed during trial and what it had been told by defendant and counsel, defendant had not made a colorable claim that the latter was ineffective. The court added that even if it did make this finding, it would exercise its discretion not to appoint new counsel to bring a motion for a new trial based on ineffectiveness of trial counsel. Defendant's motion for a new trial on other grounds, his *Romero* motion and sentencing were to proceed with defense counsel representing defendant.[8]

---

[8] Counsel ultimately filed a motion for a new trial and a sentencing memorandum, which contained a request that either or both of his strike priors be dismissed, both of which were denied. Defense counsel represented defendant at sentencing.

One month later, on the day set for sentencing, defendant filed a request to represent himself. The trial court reviewed defendant's *Faretta* waiver form. The court told defendant that unlike his two prior requests to represent himself, which the court denied as untimely, at this point, they were not faced with the time pressures of trial coming up soon, so the court was more inclined to grant defendant's request. The court explained to defendant the dangers of self-representation. Defendant asserted that something(s) the defense investigator said to him forced him to ask to represent himself. The trial court cleared the courtroom and defendant asserted that, despite his attorney's representation to the court that the one of the witnesses defendant wanted to testify about what the victim had done to him was dead and the other was in prison, the defense investigator had told him that she had located both of them. Defendant then accused the investigator of lying to him and arguing with him and said he wanted a new attorney and if the court would not appoint one, he wanted to represent himself because "these people are not for me." He again asserted that he was being railroaded and that he was deprived of the opportunity to call witnesses.

At a continuation of this hearing, which became defendant's fifth *Marsden* hearing, defendant asserted that the prosecutor had exculpatory evidence that she did not turn over to the defense. Defendant gave the court a letter he said the victim had written to him five days after his arrest, in January 2011, in which the victim asserted that someone had told her not to come to court. Defendant said that in her letters to him, the victim confessed that she had abused him physically, that she had accused him because she was angry and that his nephew had made up the whole story of defendant assaulting

21

her. He accused his attorney of failing to adequately investigate his nephew to uncover the fact that the latter was a liar and cross-examine him about it. Defendant said the prosecutor should not have been able to use his prior conviction of violating section 243 as Evidence Code section 1109 evidence. Defendant repeated that his attorney did not communicate with him. He asserted that it was his belief that he should have been able to make decisions about what witnesses to call and how to question witnesses. Defendant listed the witnesses he wanted called who were not. He said that his attorney questioned him in a way that hurt him more than it helped him. He complained that he was not allowed to ask witnesses questions.

Defense counsel identified the evidence that defendant claimed was missing that was exculpatory as transcripts of interviews. Counsel repeated that of the letters he had from the victim, none contain an admission by her that she had lied to the police. He said that a letter discussing defendant's nephew being told what to say had been placed into evidence. He said that the only things redacted from the phone calls were references to defendant's prior record. He repeated that he did not bring in evidence the letters the victim had written defendant about her violence towards him because he did not want evidence of defendant's past violent acts being introduced and the victim had admitted, while testifying, to engaging in bad acts in Las Vegas. Counsel again explained why he did not want to investigate or question defendant's nephew about his background. Counsel denied that either Las Vegas potential witness could be located. He also said that the victim had already documented her own violent history. As to defendant's assertion that the defense had not communicated with him, counsel asserted that he had

22

had conversations with defendant at jail and the defense investigator had discussed the letters and defendant's wish to testify with defendant during visits at the jail. Additionally, he reasserted that each time defendant had appeared in court pretrial, either he or one of the two defense investigators had spoken to defendant. The second defense investigator had had 13 contacts with defendant. Counsel also said that he talked to defendant every day during trial. He explained why he had examined defendant the way he did. Counsel concluded that there was enough evidence, in his opinion, of a breakdown between him and defendant such that defendant should file a motion for a new trial on the basis of ineffective assistance of counsel with the assistance of new counsel or while representing himself.

The court concluded that defendant's complaint that counsel was ineffective was not "legally sustainable" and it denied defendant's motion to have new counsel appointed. The court pointed out to defendant, as he argued with it, that the decisions as to what questions to ask on cross-examination or whether to conduct cross-examination were tactical ones for counsel to make. The court also concluded that defense counsel had given an "informed reason" for not calling certain witnesses. Defendant withdrew his request to represent himself.

In claiming that the trial court erred in failing to grant defendant's "request" for appointment of new counsel, defendant provides a much more truncated summary of his five *Marsden* motions than we have set forth above and asserts, "the trial court abused its discretion in denying at least one of [defendant's] *Marsden* motions." From this statement, defendant jumps to the next, as follows, "[Defendant's] less than stellar

23

testimony at trial supported his claim that defense counsel did not prepare him to testify, and . . . never spoke with him, evidencing a lack of communication." Unfortunately, defendant's less than stellar performance on the stand could be more an indication that counsel was correct in his assessment of defendant as a person who was difficult, did not listen well, heard things the way he wanted to hear them, and was not receptive to opinions that were contrary to his own, and his opinion that defendant should not have testified in the first place, rather than a sign that the two did not communicate. This description, which is born out by the record, also explains why both the trial court and defense counsel at one point, lost patience with defendant, who was interrupting the court, and told him to shut up, why defense counsel told defendant to eat his lunch and why counsel's admitted response to defendant's compliment about counsel's cross-examination of the victim was a "fuck you."[9] However, contrary to defendant's current assertion, they did not show that the relationship between the two had broken down. As stated above, at the time these statements had been made, counsel maintained that he could still represent defendant effectively and bore no ill will towards defendant. Moreover, defendant's claim that "counsel never spoke to him" was contradicted both by defendant's own statements and those of counsel, as set forth above, which the trial court obviously believed, as it was entitled to do. (*People v. Smith* (1993) 6 Cal.4th 684, 696.)

---

[9] We note that even though defendant was present when the trial court instructed the victim not to mention any potential punishment defendant faced as a third striker defendant managed, on two different occasions during cross-examination, and not in response to the questions being asked by the prosecutor, that he was facing a life term. We also note that defendant interrupted his attorney's argument to the jury, announcing, "Ladies and gentlemen of the jury, I'm about to be railroaded."

24

Defendant here cherry picking certain seemingly inflammatory statements made by trial counsel and defendant during the lengthy proceedings involving these five *Marsden* motions is not particularly helpful.  For example, counsel's statement during the hearing on the first motion that he was having difficulties continuing to represent defendant was probably born out of his frustration with the fact that defendant had not told him about the letters he had been receiving from the victim almost daily since his arrest.  The fact that counsel told the court, after the verdict, that he could not author a motion for a new trial on the basis of incompetency of trial counsel was not, as defendant now appears to suggest, an indication of a breakdown in the relationship between the two, but a statement of simple and undisputed fact—defense counsel had a conflict of interest in claiming that he, himself, had incompetently represented defendant at trial and because of this, defendant should be given a new trial.  Finally, as the trial court pointed out, defense counsel's opinion, during the hearing on the fifth *Marsden* motion, that there was enough evidence of a breakdown in the relationship between the two to justify the appointment of new counsel, was not for counsel, but for the trial court, to make.  (*People v. Smith* (2003) 30 Cal.4th 581, 606; *People v. Michaels* (2002) 28 Cal.4th 486, 522.) Additionally, defendant completely fails to show that the failure to appoint new counsel substantially impaired defendant's right to a fair trial, as is required.  (*People v. Webster* (1991) 54 Cal.3d 411, 435.)

2. *Admission of Evidence Code Section 1109 Evidence*

Before trial began, the People gave notice of their intent to introduce into evidence, pursuant to Evidence Code section 1109,[10] the fact that defendant engaged in conduct that resulted in his being convicted of a misdemeanor violation of section 245, subdivision (a)(1), among other acts of domestic violence in 2010. At a hearing on the admissibility of this evidence, the People added a second prior conviction—in 2000—for a misdemeanor violation of section 243, subdivision (e)(1). As to the latter, the People argued that defendant had been "primarily" in custody since committing it, therefore, the fact that it was more than 10 years old should not justify excluding evidence of it. The trial court agreed. The court noted that defendant had pled guilty to it. The court also concluded that introducing evidence of the conviction would not unduly consume time or confuse the jury. The court noted that the only similarity between it and the current offense was that both involved domestic violence against a spouse or cohabitant. The court concluded that the probative value of the evidence outweighed its prejudicial impact. The court found that evidence of the conviction was admissible.

As to the 2010 incident, the People represented to the trial court that defendant and his soon-to-be ex-wife (hereinafter, "ex-wife") had been living together when defendant called her and asked for a ride. Because defendant had been drinking the ex-wife refused to give him a ride. Defendant entered the home and, while the ex-wife was asleep on the

_____

[10] That section provides in pertinent part, "(a)(1) . . . [I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

26

couch, jumped on top of her and scratched her face, asking her how she liked it. They then engaged in mutual combat and the police were called. The prosecutor represented to the court that in the instant case, defendant beat the victim, his live-in girlfriend, with his fists, hit her legs with a stick, smashed a bowl of noodles on her head, drug her down the hall to their bedroom by her hair and continued to beat her with his fists in the bedroom. Defendant's nephew called the police and they came out, but defendant had already left. The police took a report and left, then defendant returned and tried to sneak into the house, his nephew called the police again, defendant took the phone from his nephew and hung it up, then left and the police arrived thereafter.

The court concluded that the 2010 incident was substantially similar to the charged incident and evidence of the former would not confuse the jury or consume undue time. The court concluded that the probative value of the evidence outweighed its prejudicial effect. The court ruled it would allow the ex-wife to testify about the incident[11] and the prosecutor to introduce evidence of defendant's conviction of the offense resulting from it.

During the People's case-in-chief, a deputy district attorney (not the prosecutor) testified for the prosecution that defendant had been charged in 2000 with misdemeanor "domestic battery" or "battery on a person in a dating relationship," to which defendant had pled guilty. He also testified that in 2010, defendant had been charged with felony corporal injury to a spouse (i.e., defendant's ex-wife), and defendant had pled guilty to a

---

[11] She ultimately did not.

misdemeanor assault with a deadly weapon or by means of force likely to produce great bodily injury, as part of a plea bargain. Copies of documents supporting this testimony were introduced as exhibits. Because defendant chose to testify, he was also impeached with both of these prior convictions, along with a number of others.

There was evidence of yet another incident of domestic violence introduced at trial. Specifically, at the beginning of her testimony, the victim had said that on the morning of January 23, 2011,[12] she and defendant had an argument because a person who ultimately testified at trial as a defense witness was coming to her home to finish doing her hair, and defendant had gotten mad and hurt the victim. Defense counsel's string of relevancy and other objections to this line of testimony was largely overruled. The prosecutor then asked for a sidebar, during which she objected to defense counsel interjecting an object to every question she asked about this incident. Counsel said he was not opposed to having a continuing objection to the entire line of questioning. The trial court said the evidence was relevant because "it's all connected." The victim went on to testify that defendant kicked her out the back door, she went to the front and cussed defendant out, came in the house to get her stuff and he socked her in her left eye. Thereafter, defendant got her a towel because she was bleeding, "they" called a friend, who took both of them to the hospital, where her wound was stitched, and the friend took them both back home. During the recorded interview of the victim which was played for the jury, she said that she had gone to the hospital the morning of January 23 and had

---

[12] The charged incident happened that afternoon.

28

gotten stitches. She also said that when she had gotten hit in the morning, she had told people at the hospital that she had fallen on the railroad tracks. During his testimony, defendant denied hitting the victim earlier on January 23. During argument to the jury, the prosecutor said this incident, as well as the 2000 conviction and the 2010 conviction, could be used by the jury to determine whether defendant committed the charged offense during the afternoon of January 23.[13] Defendant did not object to this argument.

---

[13] Because the prosecutor specifically told the jury during argument that the violation of section 273.5, subdivision (a) referenced in the instruction on the Evidence Code 1109 evidence was the January 23 morning incident, we reject the People's assertion that evidence of that incident was introduced *only* under Evidence Code section 1101, subdivision (b) to negate any possible mistake of fact or accident. Moreover, the jury instruction on the Evidence Code section 1109 evidence references evidence of a violation of section 273.5 separate from the 2000 conviction and the 2010 conviction and the instruction on Evidence Code section 1101 evidence references a violation of section 273.5. Since these two instructions refer to evidence of an offense other than the charged offense, logic dictated that they referred to the morning incident.

While we realize that evidence of the morning incident was not part of the pretrial discussion of Evidence Code section 1109 evidence, and when defense counsel objected to it at trial, he failed to assert that it should not be admitted under Evidence Code section 1109, we will side step whatever waiver occurred as a result of this and address defendant's objections to admission of evidence concerning it on the merits of his Evidence Code section 1109 argument. We do this because we also realize that the People failed to give defendant notice pretrial that they planned to use this evidence for purposes of Evidence Code section 1109 as that section requires. (Evid. Code, § 1109, subd. (b).)

However, we will not address whatever objections defendant might have to admission of this evidence under Evidence Code section 1101 because defendant did not specifically address use of this evidence to rebut mistake of fact or accident in his opening or reply briefs, although he asserted, without further comment as to this application, that the factors relevant to admission under Evidence Code section 1109 were also relevant to admission under Evidence Code section 1101. We will hold defendant to the waiver he created by not mentioning Evidence Code section 1101 when he objected at trial about the evidence concerning the morning incident. Contrary to the assertion in defendant's reply brief, summarily referencing Evidence Code section 1101 in his opening brief does not somehow "undo" this waiver.

Although conceding that several courts of appeal, including this one (*People v. Hoover* (2000) 77 Cal.App.4th 1020, 1027, 1028 (*Hoover*)),[14] have held that using evidence of prior acts of domestic violence to prove a currently charged act of domestic violence is not a violation of due process (*People v. Williams* (2008) 159 Cal.App.4th 141, 147; *People v. Cabrera* (2007) 152 Cal.App.4th 695, 703, 704; *People v. Rucker* (2005) 126 Cal.App.4th 1107, 1120; *People v. Price* (2004) 120 Cal.App.4th 224, 240; *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1096; *People v. Jennings* (2000) 81 Cal.App.4th 1301, 1309, 1310; *People v. James* (2000) 81 Cal.App.4th 1343, 1353; *People v. Brown* (2000) 77 Cal.App.4th 1324, 1335; *People v. Johnson* (2000) 77 Cal.App.4th 410, 417-420), defendant disagrees. In so doing, he advances a premise that ignores what actually occurred in this case. He asserts, "[c]onvicting [defendant] of a crime based largely on evidence that he had committed some other crimes and was a person of general bad character is a violation of . . . due process . . . ." However, defendant was not convicted "largely" on evidence of these prior acts—he was "largely" convicted on the testimony of the victim and his nephew. Additionally, there was no evidence introduced that defendant was a person of general bad character. There was evidence that the victim was, however, that did not appear to dissuade the jury from believing her. Defendant offers no persuasive argument for this court to depart from the position it took 13 years ago in *Hoover*.

---

[14] Defendant failed to cite *Hoover*. We do not.

30

Next, defendant asserts that the trial court abused its discretion in concluding that the probative value of this evidence outweighed its prejudicial effect. Defendant begins with the court's conclusion that evidence of the 2000 misdemeanor conviction was admissible in the interests of justice,[15] because defendant had not lead a legally blameless life since suffering that conviction. Unfortunately for defendant, he completely ignores the trial court's justification for its finding and asserts only that because evidence of the 2010 conviction and the incident the morning of January 23 was available for use by the prosecution, introducing evidence of the 2000 conviction was "overkill." However, the trial court's finding is supported by the record, and, therefore, we cannot conclude that the court abused its discretion in determining that the evidence should be admitted in the interest of justice. Moreover, defendant did not make this argument below, and, therefore, waived it. (Evid. Code, § 354.)

In what we are assuming is an argument that the trial court abused its discretion in finding that evidence of all three incidents was more probative than prejudicial, defendant calls our attention to four factors he asserts the trial court should have considered, i.e., the inflammatory nature of the uncharged conduct, the possibility of confusion of issues, the remoteness in time of the uncharged offense and the amount of time involved in introducing and refuting evidence of the uncharged act. (See *People v. Branch* (2001) 91 Cal.App.4th 274, 282.) However, he applies none but one of these factors in any but a

---

[15] Evidence Code section 1109, subdivision (e) provides that if the prior act occurred more than 10 years before the charged act, evidence of it is inadmissible unless the trial court finds that admission is in the interests of justice.

conclusory fashion to this case, and asserts only, again, in conclusory fashion, that the probative value of this evidence did not outweigh its prejudicial impact. This is insufficient. As to the one factor he does concretely address, confusion between the incident of the morning of January 23 and the charged incident that afternoon, he asserts that, somehow, the trial court's failure to give a unanimity instruction left the jury confused about whether the charged offense was the morning or the afternoon incident. However, trial counsel made it abundantly clear in their argument to the jury that the charged offense was the second incident and the morning incident was one of the "other acts" the jury could consider in determining if defendant committed the charged act.[16] Moreover, if the "charged act" was the morning incident, there would have been little cause for the defense to challenge the testimony of defendant's nephew as it did, or for the prosecutor, in his argument to the jury, to elevate the nephew to the position of being the only person whose testimony could be wholly believed, as, according to the victim, the nephew did not even witness it and he certainly did not testify about it. Further, another instruction given the jury as to the morning incident makes clear that it did not constitute the charged act.

Defendant then departs from the four factors he lists, asserting that the prior act must be sufficiently similar to make the former relevant. After discussing at length a case in which there was little similarity between the two, defendant asserts, again, in summary

---

[16] The prosecutor's opening statement is not part of the record before this court.

32

fashion, without further analysis, "Same [*sic*] was true in [defendant's] trial." Again, this is insufficient.

Next, defendant makes an assertion that is belied by the record, i.e., that there was such a "paucity of evidence . . . on the charged offenses [*sic*]" that admission of evidence of these other acts was an abuse of discretion. We disagree. There was more than sufficient evidence to support the verdict.

Finally, defendant asserts that introduction of this evidence put him in the unfair position of having to defend against the prior incidents. Of course, there's not much for a defendant to do where, as here, he has pled guilty in relation to the two prior convictions. Moreover, that "burden," however onerous it might be, has not persuaded this court or many others to conclude that Evidence Code section1109 is unconstitutional.

Finally, defendant criticizes the trial court for failing to give a cautionary instruction that the jury may not consider evidence of these three incidents as proof of defendant's guilt. First, such an instruction would completely undermine Evidence Code section 1109, which specifically provides that such evidence may be so considered. Second, the jury was instructed that it *could, but was not required to* conclude that defendant was disposed or inclined to commit domestic violence and was likely to commit and did commit the charged offense if it decided that defendant committed the prior acts. The jury was also cautioned that concluding that defendant committed the other acts was only one factor to be considered along with all the other evidence and was not sufficient, by itself, to prove defendant's guilt. Defendant cites no authority holding that any further cautionary instruction should have been given.

33

3. *Failure to Dismiss Defendant's Strike Priors*

Defendant's criminal history began when he was 19 and includes, besides the misdemeanor domestic violence convictions already mentioned, theft, drug possession, evading, battery, driving under the influence, robbery, shooting at an inhabited dwelling and assaults. His probation had been revoked in the past and he was on parole when he committed this offense.

The trial court denied defendant's request to dismiss both or one of his strike priors citing his use of a weapon on the victim, which resulted in stitches and a wound to her head, "serious injur[ies, . . . that c]ould have been much more serious[,]" and his history of crimes, especially crimes of violence. Defendant asserts that the trial court's ruling was an abuse of discretion.

In asserting that the trial court made a ruling that was so irrational or arbitrary that no reasonable person could disagree with it (*People v. Carmony* (2004) 33 Cal.4th 367, 376, 377), defendant misconstrues the court's words. After listening to both defendant and the victim, the court said that it had compassion for both, but it could not be guided solely by that compassion without consideration for the community. Contrary to defendant's assertion, the trial court did not say that the law would not allow it to effectuate justice for defendant and exercise compassion, just that those could not be the only considerations the court relied on in making its decision. We reject defendant's assertion that his age (37 at the time of sentencing) and the victim's desire that he not spend 29 years to life in prison, compel a conclusion that the court's ruling was so arbitrary and capricious that no reasonable person could disagree with it.

34

## DISPOSITION

The trial court is directed to amend the first page of the Abstract of Judgment to show that defendant received a term of 25 years to life for violating section 273.5, subdivision (a), and not life, as the abstract currently states.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

KING
J.

CODRINGTON
J.