Filed 6/22/22  P. v. Kirkpatrick CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>KELVIN KIRKPATRICK,<br><br>Defendant and Appellant. | B303320<br><br>(Los Angeles County Super. Ct. No. NA096371) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Richard R. Romero, Judge.  Affirmed.

Jeralyn Keller, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Rodriquez, Acting Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, William H. Shin and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Kelvin Kirkpatrick (defendant) of the first degree murder of Richard Vidaurry (Vidaurry). The trial court sentenced defendant to life in prison without the possibility of parole. We are asked to decide whether the record demonstrates the trial court had an improper ex parte communication with the jury during deliberations. We also resolve defendant's claims of sentencing error, which were not raised by objection in the trial court.

## I. BACKGROUND

### A. *The Murder*

On the morning of May 7, 2013, Ignacio Gonzales (Gonzales) was waiting outside Bowtie Connection, an auto body shop in the City of San Pedro. Gonzales was waiting for Vidaurry, who also worked at the body shop, to arrive and open the business.

At 8:20 a.m., Vidaurry drove up in a pick-up truck and parked on the street in front of the shop. The truck belonged to John Kennedy (Kennedy), Bowtie Connection's owner, and he lent the truck to Vidaurry for a month while Vidaurry's car was being repaired. Normally, Kennedy would use the truck to drive to the shop.

As Vidaurry was parking, Juan Sanchez (Sanchez) was leaving a market across the street from Bowtie Connection. After Vidaurry exited the truck, Gonzales and Sanchez saw a man wearing a hoodie-style sweatshirt, gloves, and a dust or dentist-style mask approach Vidaurry from behind and shoot him once in the head with a handgun. The shooter then fled the scene on foot, and Sanchez called 911.

The coroner determined Vidaurry died at the scene and characterized the gunshot wound to his head as a type that that would be "rapidly" or "instantly" fatal. The coroner further determined the fatal gunshot was a "contact" wound, meaning the barrel of the gun was in contact with or in close proximity to the back of Vidaurry's head when the gun was fired.

### B.     Investigation of the Murder

Los Angeles Police Department detectives interviewed a number of witnesses to the shooting, including Ryan Yasin (Yasin). On the day of the shooting, he was sweeping the streets and emptying trash cans in the neighborhood. At approximately 7:30 a.m., less than an hour before the shooting, Yasin saw a man sitting at a bus stop near the market that was across the street from Bowtie Connection. Yasin thought the man looked "suspicious" because he was wearing a black hoodie with the hood up, gloves, and a dust mask. Approximately 40 minutes later, as he was cleaning another street, Yasin saw the same man running "full force" away from the area near the bus stop.

Using witness statements about the direction in which the shooter fled, detectives canvassed the area in search of surveillance camera footage. Using recovered footage, detectives were able to trace the gunman's path from the scene of the shooting. The gunman first ran through a parking lot toward an alley, where the murder weapon was later found in a dumpster. Ultimately, the gunman arrived at the apartment of Derrick Breedlove (Breedlove), which was located approximately three blocks from where Vidaurry was shot. From surveillance footage inside Breedlove's apartment building, police were able to identify the gunman as defendant.

3

The police subsequently obtained records for defendant's and Breedlove's cell phones. Roughly three weeks before Vidaurry's murder, Breedlove texted defendant that "a [s]ituation came up and [there was] some money . . . attached to it [and] I figured I[']d run it by you." Defendant, who had been recently been released from prison, responded positively: "Fa show[.] [W]hat's da deal[?] I need some cash." A few days after that, defendant texted Breedlove, asking when an unidentified "cuz" wanted the job done and "[h]ow much cuz try[ing] to pay me [for] it?" On the evening of April 18-19, Breedlove responded, "[$]3000. [H]e just want y[o]u t[o] p[o]p him below da waist a few times but [yo]u d[o] w[ha]t [yo]u g[o]t t[o]." Defendant responded he understood and asked whether he would be supplied with a "burner," i.e., a gun. Breedlove said he would and advised he would learn the intended victim's "r[o]utine" and provide aid by monitoring police communications via a "scanner."

### C.     Trial and Post-Trial Proceedings

The Los Angeles County District Attorney charged defendant with murder and alleged two special circumstances that made defendant eligible for a life in prison without parole sentence: murder for financial gain and murder by lying in wait.[1] The information against defendant further alleged defendant personally and intentionally used and discharged a handgun in the commission of the crime. The charges were tried to a jury.

---

[1]     Breedlove was charged with Vidaurry's murder in the same pleading. The trial court held a joint trial with separate juries impaneled for each defendant. Breedlove's jury found him guilty of first degree murder.

4

### 1. Defendant's testimony

After the prosecution's case-in-chief, which produced the evidence establishing the facts recited thus far, defendant testified during the defense case. He explained that, shortly after he was released from prison, he met with Breedlove (who he met in prison) and a mutual friend Keon "Cuzzo" Collins (Collins). Approximately one month before the shooting, in early April 2013, the three men devised a plan to sell marijuana outside of California.

Defendant claimed that, unbeknownst to Breedlove, Collins offered to pay defendant to injure Kennedy, the owner of Bowtie Connection. Collins wanted Kennedy harmed because he was upset over restoration work Kennedy had done on one of his vehicles. According to defendant, Collins wanted defendant to "beat [Kennedy] up badly to teach him a lesson."

Defendant testified that a few weeks later, in late April, Collins met with defendant. At that meeting, Collins showed defendant a picture of Kennedy and described Kennedy's pickup truck, the route he drove to work, the time he usually arrived at the shop, and the location of Bowtie Connection. In addition to giving defendant a dust mask and latex gloves, Collins also attempted to give defendant a handgun and said he wanted Kennedy shot in the knees. Defendant claimed he refused to shoot Kennedy but told Collins he would break his legs for a smaller payment.

Defendant admitted he arrived at Breedlove's apartment hours before Vidaurry was shot. Defendant said he went to the apartment to help pack up the marijuana he and Breedlove planned to sell out of state. Defendant also admitted he was the man seen in the surveillance videos wearing gloves and a mask

5

leaving Breedlove's apartment at approximately 7:30 a.m. and walking toward Bowtie Connection; defendant further conceded that he waited at the bus stop for Kennedy to arrive at the auto body shop.

According to defendant, his plan was to follow Kennedy inside the shop and use his mixed martial arts training to assault Kennedy. Defendant testified he was nervous because he was violating the conditions of his parole and he became even more nervous after two police cars drove past the bus stop where he was waiting. At 8:15 a.m., just five minutes before Vidaurry was shot, defendant testified he abandoned his plan after he saw a third police car drive by.

Defendant denied he was the man seen on surveillance video running away from the murder scene toward the alley where the murder weapon was recovered. Defendant did admit, though, that he was the person seen on surveillance footage returning to Breedlove's apartment at approximately 8:30 a.m.

Defendant claimed that the day after Vidaurry's murder defendant called Collins and told him he had not carried out the planned assault on Kennedy due to police presence in the area. Defendant said he would make another attempt before he left California to sell marijuana elsewhere. According to defendant, Collins said he suspected defendant was not fully committed to the plan and "got someone else to take care of [Kennedy]."

> 2. *The reporting and handling of jury questions during deliberations*

Immediately after the jury began its deliberations, the trial court advised defense counsel and the prosecutor of its procedure for jury requests. The court stated: "If there is a need for

readback, of course, I will contact both counsel and indicate what the readback would be.  My preference is [for] the readback [to be performed] in the jury room with only the twelve jurors and the reporter.  Otherwise, it's open court with everyone."  Defense counsel stated his preference was to have any testimony read to the jury in the courtroom with his client present.  The court acceded to that request.  The jury concluded its first day of deliberations without reaching a verdict.[2]

The following day, the jury resumed its deliberations at 10:11 a.m.  At 11:34 a.m., the jury presented the trial court with a written request submitted on a "jury request or question" form that asked to hear a reading of the testimony from the only witness called by the defense besides defendant: a woman who testified she was working not far from Bowtie Connection at the time of the shooting and saw a man in dark clothing and a mask—who was not defendant.  The jury also asked to view People's Exhibit 113, a video taken from a police car's dash camera retracing the shooter's route following the murder.  At 1:41 p.m., after the jury resumed its deliberations following its noon recess, the trial court and counsel conferred regarding these two jury requests.  Then, in the presence of defendant and his counsel in the courtroom, the requested testimony was read to the jury and the jury was shown the dash camera recording.  At

---

[2]     After proceedings were adjourned for the day, the court discussed with counsel a request by an alternate juror to be absent on certain days to attend a previously scheduled event.  Counsel stipulated that the alternative juror could be absent.  The colloquy between the court and counsel regarding the request was not transcribed by the reporter.

7

1:58 p.m., the jury resumed its deliberations in the jury room. The proceedings concerning the jury's requests were memorialized by both the court clerk and the court reporter.

Later that day at 3:31 p.m., according to a minute order in the record, the jury informed the trial court it had a question. According to the minute order, at 3:37 p.m., the trial court prepared a written response to the jury's question and returned the answer to the jury without notifying counsel.[3] The minute order does not discuss the substance of either the jury's question or the court's response, and the clerk's transcript does not include a copy of any question or any response thereto.[4]

At 3:51 p.m., 14 minutes after the clerk's minute order indicates the court responded to the question asked by the jury, the jury advised it had reached a verdict. The jury found defendant guilty of first degree murder. (Pen. Code,[5] § 187, subd. (a).) The jury also found true allegations that the murder was carried out for financial gain (§ 190.2, subd. (a)(1)) and by means of lying in wait (§ 190.2, subd. (a)(15)), plus various firearm use allegations (§ 12022.53, subds. (b)-(d)).

---

[3] The minute order indicates the court did not confer with counsel because it states counsel returned to the courtroom only after the jury informed the court it had reached a verdict.

[4] On our own motion, we take judicial notice of the contents of the superior court's case file. Our review of the file indicates it includes no further information about the jury question and court response that are referenced in the aforementioned minute order.

[5] Undesignated statutory references that follow are to the Penal Code.

8

###### 3. *Defendant's post-trial motions and sentencing*

In October 2018, a month after defendant's conviction, defense counsel reviewed the court's minute order for the court day when the jury returned its verdict and saw the reference to a jury question and response to which counsel had not been alerted. A month after that, defendant moved to unseal the jurors' identifying information to enable contacting the jurors— but counsel's motion to unseal was not predicated on the question and response disclosed in the minute order. Rather, the sole ground asserted for discovering the jurors' identifying information was the conduct of Juror No. 10 during the reading of the verdict. According to the supporting declaration by defendant's trial attorney, Juror No. 10 was "very upset and had to be helped to her seat," she cried during the reading of the verdict, and when the jury was polled she "was so upset she could not answer initially" and could only mouth the word "yes" when she was asked if she shared in the other jurors' verdict and findings. According to defense counsel, such conduct was so "completely out of the ordinary" that it suggested the possibility of "coercion" or other juror misconduct.

At the hearing on the motion to unseal juror information, defendant's attorney argued the issue as briefed and did not complain about (or otherwise raise) the jury question the court apparently answered without alerting counsel. After hearing argument, the trial court denied the defense motion to unseal juror information. The court explained it had studied Juror No. 10 closely as she affirmed the verdict as her personal verdict because it was "keenly aware" of the possibility that Juror No. 10 had been subject to pressure by the other members of the jury. The court concluded from its observations that Juror No. 10's

9

emotion was merely an "understandable" reaction to "the gravity of what was going on."

In January 2019, more than four months after the jury rendered its verdict, defendant filed a motion for a new trial, contending, among other things, that the trial court erred by not alerting his attorney to the question raised by the jury just minutes before it announced it had reached a verdict. Defendant argued the trial court denied him due process by not giving his attorney the opportunity to participate in crafting a response to the jury's question. The People opposed the motion for a new trial, arguing defendant "failed to make the requisite showings that the court misdirected the jury in a matter of law or erred in the decision of any question of law arising during the course of the trial."

The trial court ruled on defendant's new trial motion and sentenced defendant at a hearing in December 2019 (some 14 months after the jury rendered its verdict). The court denied the motion and found defendant had not established the court's response to the jury question referenced in the minute order concerned anything of legal importance. The court stated: "I have no recollection of th[e jury question or my response]. It's my practice, obviously, to disclose to counsel communications from the jury. Anything significant I disclose to the attorneys." The court added: "It must have been something trivial, and I have no idea what it was, but I can't believe that if there were anything touching on the issues of the case that I would not have told counsel about it, but that may be speculation on my part."

Proceeding to sentencing, the trial court heard defendant's allocution and victim impact statements from members of Vidaurry's family, one of his co-workers, and a friend. The court

10

sentenced defendant to life without the possibility of parole for the special circumstance murder. As reflected in the reporter's transcript of the hearing, the trial court's choice of language suggested it might be staying a second sentence of 25 years to life for the murder conviction: "The 25 to life [sentence] that would normally be imposed is not imposed because of the special circumstance allegations. So the 25 to life is stayed on the first degree murder." Notwithstanding the court's reference to a 25 years to life sentence that was "stayed," neither the clerk's minute order nor the abstract of judgment reference any stayed additional punishment for the murder conviction beyond the life without parole sentence.

With regard to the jury's true findings on the section 12022.53 firearm enhancement allegations, the court imposed a consecutive 25 years to life sentence for the subdivision (d) finding and stayed the lesser sentences on the subdivision (b) and (c) allegations. Defense counsel did not ask the trial court to exercise its discretion to strike or dismiss any of the firearm enhancements pursuant to section 12022.53, subdivision (h) or otherwise object to the court's sentencing on the firearm enhancements.

## II. DISCUSSION

Defendant claims he is entitled to reversal of his conviction because the trial court had an improper ex parte communication with the jury, that is, the unspecified question and answer just before the jury's verdict. The record we have establishes, at most, that the court responded to a jury question without informing counsel. That, however, is not improper in all circumstances (e.g., when the question concerns non-substantive

11

matters like how and when to deliver verdict forms), and nothing establishes the answer to the question at issue here was error such that reversal is required.

Defendant also has not established the trial court committed sentencing error. The court's ambiguous remark about a "stay" of a 25 year to life sentence on the murder conviction does not indicate such a sentence was imposed but stayed (as opposed to an unartful description of a sentence that did not apply in this case even though it does in many other murder cases)—particularly when viewed in conjunction with the sentencing hearing minute order and abstract of judgment, neither of which reflect an imposed but stayed 25 years to life sentence. Defendant's claim that the court should have stricken the section 12022.53, subdivision (d) firearm enhancement in the interest of justice is forfeited because he did not ask the trial court to exercise its discretion and strike the enhancement at sentencing.

### A. Defendant Has Not Established the Trial Court Improperly Responded to a Jury Question

A trial court's communications with a deliberating jury should generally occur in the presence of the parties. "A criminal defendant has the right under the state and federal Constitutions to be personally present and represented by counsel at all critical stages of the trial." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 465 (*Bryant*); see also § 1138 ["the information required [by the jury] must be given in the presence of, or after notice to, the prosecuting attorney, and the defendant or his counsel, or after they have been called"].) "For purposes of the right to be present, a critical stage is 'one in which a defendant's

12

"'absence might frustrate the fairness of the proceedings'" [citation], or 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" [Citation.]" (*Bryant, supra*, at 465.)

"'[N]ot every communication between the judge and jury[, however,] constitutes a critical stage of the trial.' [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 987 (*Clark*).) For example, a trial court's ex parte offer to provide the jury with additional instruction or information alone does not violate a defendant's constitutional rights. (*People v. Mickle* (1991) 54 Cal.3d 140, 174 [no error where trial court "simply offered to provide further instruction in open court . . . . [and] [t]he offer was not accepted"]; see also *ibid.* ["A statutory or constitutional violation occurs only where the court actually provides the jury with instructions or evidence during deliberations without first consulting counsel"].) In addition, "a trial court properly may engage in ex parte communications for "'scheduling, administrative purposes, or emergencies that do not deal with substantive matters . . . .'" [Citations.]" (*Clark, supra*, 52 Cal.4th at 987; accord, *Bryant, supra*, 60 Cal.4th at 466 [the defendant's constitutional rights were not violated when the trial court held two in camera meetings with the jurors from which all parties were excluded because the meetings were for administrative purposes and did not deal with substantive matters]; see also *People v. Delgado* (1993) 5 Cal.4th 312, 330 (*Delgado*) ["""[T]here is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial. The . . . conclusion that an unrecorded *ex parte* communication between trial judge and juror can never be

13

harmless error ignores these day-to-day realities of courtroom life and undermines society's interest in the administration of criminal justice.'" [Citation]"], second alteration in original.)

On appeal, reviewing courts do not presume that any communication with a jury that occurs outside the presence of the parties was improper—indeed, the contrary is true. As our Supreme Court has explained, "[w]hile we strongly reiterate the proscription against 'private communications between court and jury,' we do not infer from either the fact of the communication or the absence of a contemporaneous verbatim record that a prejudicial contact occurred." (*People v. Hawthorne* (1992) 4 Cal.4th 43, 69.) To find a constitutional violation, the record must show the trial court not only had an ex parte communication with the jury, but also actually provided the jury with instructions or evidence during deliberations without first consulting counsel. (*Id.* at 67 ["The mere potential for impropriety . . . cannot sustain an inference of misconduct"].) This is so because, "[a]bsent an indication to the contrary, we are required to presume a court was aware of, and followed, the applicable law . . . ." (*Peake v. Underwood* (2014) 227 Cal.App.4th 428, 447; see also *People v. Carter* (2003) 30 Cal.4th 1166, 1214-1215.)

That presumption controls here. Putting aside the question of whether defendant waived his claim that there was improper communication between the court and jury by failing to object in the trial court at a point when a record of what occurred could have been reconstructed,[6] the record we do have does not show

---

[6]     To recapitulate, shortly after trial, the defense learned from the pertinent minute order that the court had answered a jury

14

the communication concerned substantive matters such that the parties should have been present (or informed about the jury's question before a response was prepared). Instead, all we know looking solely at the pertinent minute order is that less than 15 minutes before the jury announced it had a verdict, the trial court responded to a jury question. We also know from the reporter's transcript that the trial court responded to the jury's earlier request for a readback of testimony in open court and stated it had a practice of disclosing to counsel any significant communications from the jury. This, plus the presumption that official duty was regularly performed (Evid. Code, § 664), compels rejection of defendant's naked assertion that reversal is required because there was an improper communication with the jury.

### B. *The Trial Court Did Not Impose an Unauthorized Stayed Sentence for Defendant's Murder Conviction*

Section 190, subdivision (a), sets forth three alternative punishments for first degree murder: "[D]eath, imprisonment in the state prison for life without the possibility of parole, or imprisonment in the state prison for a term of 25 years to life." Here, after the trial court stated the "normal" 25 year to life sentence was not available due to the jury's special circumstance finding, the court said the 25 years to life sentence "that would

---

question without the parties being present. The defense took no immediate action to preserve and discover the memories and notes of those present. Then, when the defense brought a motion seeking juror identifying information, the motion still raised no objection to the unreported question and answer.

15

normally be imposed is not imposed" and added "the 25 to life is stayed on the first degree murder."

Where there is a discrepancy between the oral pronouncement of a sentence and the sentencing minute order or abstract of judgment, the oral pronouncement ordinarily governs. (*People v. Price* (2004) 120 Cal.App.4th 224, 242; see also *People v. Mitchell* (2001) 26 Cal.4th 181, 185 ["An abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize"].) Under certain circumstances, however, courts will "deem the minute order and abstract of judgment to prevail over the reporter's transcript. [Citations.]" (*People v. Cleveland* (2004) 32 Cal.4th 704, 768.) For example, where a sentencing court misstates a term but the minute order and abstract of judgment correctly state the term, the court's misstatement may be of "no effect" and the minute order and abstract of judgment may control. (*Ibid.* [trial court incorrectly referred to one-year term under § 667.5 but defendant was charged with and admitted only a prior serious felony conviction under § 667 as accurately reflected in the minute order and abstract of judgment].)

In view of the trial court's recognition that the "normal" sentence of 25 years to life was unavailable (due to the jury's special circumstance findings) and "not imposed," we believe the trial court's additional, ambiguous statement about a stay is best construed in light of the minute order and abstract of judgment. No stayed term of 25 years to life was imposed, and no correction of the judgment to delete any such stayed punishment is required.

16

## C. *Defendant's Firearm Enhancement Argument Is Forfeited*

Roughly two years before defendant was sentenced, the Legislature gave trial courts discretion "in the interest of justice . . . at the time of sentencing, [to] strike or dismiss an enhancement otherwise required to be imposed by" other provisions of section 12022.53. (§ 12022.53, subd. (h), as amended by Stats.2017, ch. 682, § 2).  Defendant did not ask the trial court to strike the section 12022.53, subdivision (d) enhancement or object to its imposition.

"As a general rule, only 'claims properly raised and preserved by the parties are reviewable on appeal.' [Citation.]" (*People v. Smith* (2001) 24 Cal.4th 849, 852.)  Our Supreme Court adopted this waiver rule "'to reduce the number of errors committed in the first instance' [citation], and 'the number of costly appeals brought on that basis' [citation]." (*Ibid*.)  In the sentencing context, our highest court has "applied the rule to claims of error asserted by both the People and the defendant. [Citation.]  Thus, all 'claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices' raised for the first time on appeal are not subject to review. [Citations.]" (*Ibid*.)

Because defendant failed to object to the section 12022.53, subdivision (d) enhancement or otherwise urge the trial court to exercise its discretion under section 12022.53, subdivision (h), defendant's argument on that ground presented for the first time on appeal is forfeited.

DISPOSITION

The judgment is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


BAKER, J.

We concur:



RUBIN, P. J.



MOOR, J.